The PEOPLE of the State of Colorado,
Plaintiff-Appellee,

v.

Michael J. BARTOWSHESKI,
Defendant-Appellant.

No. 81SA556.

Supreme Court of Colorado,
En Banc.

March 7, 1983.

As Modified in Denial of Rehearings
April 18, 1983.

J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., John Daniel Dailey, Asst. Atty. Gen., Denver, for plaintiff-appellee.

J. Gregory Walta, Colorado State Public Defender, James England, Deputy State Public Defender, Denver, for defendant-appellant.

QUINN, Justice.

The defendant, Michael J. Bartowsheski, appeals from judgments entered in the Arapahoe County District Court on guilty verdicts to the charges of first degree murder after deliberation, first degree felony murder, and robbery, all of which involved a single victim.[1] Bartowsheski's claims of error relate to the trial court's refusal to grant a second change of venue due to allegedly prejudicial publicity, the claimed insufficiency of evidence for the crimes charged, the trial court's failure to instruct on voluntary manslaughter, and the entry of judgments of conviction on all three charges. Although we conclude that the defendant was properly convicted of murder in the first degree, we hold that it was inappropriate for the trial court to enter separate judgments of conviction on the three separate verdicts. We accordingly vacate the judgments of conviction and remand the case for the entry of appropriate judgments and for resentencing.

I.

■ The defendant was originally charged in separate counts with first degree murder after deliberation,[2] felony murder in the course of robbery,[3] and robbery.[4] The charges arose out of the death of Michelle Talbott, an eight year old child, on December 16, 1978, in her home in Elbert County, Colorado. The brutality of the killing and the victim's age generated extensive publicity about the homicide. The Rocky Mountain News and the Denver Post, the two major Denver newspapers, published approximately fifteen articles about the crime prior to the defendant's trial. Several of these articles were published in December of 1978, when the child was killed, and the others were published in June and July of 1979. Jury selection had begun in the Elbert County District Court on June 26, 1979. The defendant made several requests for a change of venue due to pretrial publicity. On the fourth day of jury selection, after the interrogation of ninety-seven prospective jurors had produced only five persons who could potentially serve on the jury, the motion was granted and venue transferred to neighboring Arapahoe County. On July 9, 1979, jury selection again began. Over a period of six days

1. The defendant's appeal was transferred to this court because of the constitutional claims raised by him. *See* section 13–4–102(1)b and 13–4–110(1)(a), C.R.S.1973.

2. Section 18–3–102(1)(a), C.R.S.1973 (1978 Repl.Vol. 8).

3. Section 18–3–102(1)(b), C.R.S.1973 (1978 Repl.Vol. 8).

4. Section 18–4–301, C.R.S.1973 (1978 Repl.Vol. 8).

ninety-eight potential jurors were examined. During the voir dire the defendant again made repeated requests for a change of venue. The trial judge denied these requests, but expressly noted that any doubt about whether a juror should be excused would be resolved in favor of the defendant.[5] Of the ninety-eight potential jurors, approximately twenty-eight were excused for cause on the basis of a preconceived opinion due to pretrial publicity, while at least one-fourth of the panel could not recall ever having read or heard about the case. The defendant did not challenge for cause any of the fourteen jurors actually selected to serve, each of whom unequivocally professed an ability to be impartial.[6] Of these jurors only three remembered details of the case, and the extent of their knowledge was limited to basic facts.

On July 17, 1979, the evidentiary phase of the trial commenced. The prosecution's evidence was circumstantial and established the following facts. In November of 1978 the defendant was hitchiking in Nevada and was given a ride by a young man named Boyd Tarwater who, like the defendant, had no specific destination. A friendship developed between the two men, and Tarwater agreed to accompany the defendant to Colorado, where Bartowsheski knew of possible employment prospects through a man who owed him money. The man that the defendant had in mind was Richard Talbott, who with his wife Nancy and their four children lived in a home in Kiowa, Colorado. When the defendant and Tarwater arrived in Kiowa in late November, Talbott did secure employment for them at his landscaping business and also permitted them to share a basement room in the Talbott home with their twelve year old son.

On the evening of Friday, December 15, 1978, the defendant and Tarwater decided to spend the evening visiting several bars. They left the Talbott home just as Richard Talbott was arriving. They asked him to join them and he refused. A short discussion followed between Talbott and the defendant concerning the money which each believed to be owing from the other. After Talbott suggested that they discuss the matter on the following morning, the defendant and Tarwater drove off.

The defendant and Tarwater spent the evening at several bars, where they played pool and drank beer. In the course of the evening they visited the Stagecoach Inn in Franktown, Colorado, where they experienced difficulties in starting Tarwater's pickup truck and were forced to secure the assistance of another bar patron who was able to "jump start" the vehicle. They eventually headed back to the Talbott home and decided on their way to leave Colorado in favor of a visit to Tarwater's relatives in Kansas. They also decided, in order to compensate for the money Talbott allegedly owed the defendant, to steal several guns owned by Talbott. They accordingly stopped at the Talbott home.

According to Tarwater, who testified as a prosecution witness, he remained in the truck to keep it running while the defendant went into the Talbott home to recover their possessions and the guns. When the

---

5. The court allowed extensive voir dire of the potential jurors to ensure that the jurors selected would in fact be able to render a fair and impartial verdict. The judge expressly stated, when the prosecution asked the basis for his dismissal of one potential juror, that he intended to resolve any doubts in favor of the defense. At another point during jury selection the judge noted "the prospective jury, as presently constituted in the mind of the Court, is totally divorced from any knowledge of the case, any acquaintanceship with any other participants, or any witness to be called; and with it pictured that way, it is the purpose of the Court to see if we can't preserve that all the way down the road." We believe that the court acted within its discretion in the methods chosen to counteract the publicity about the case. See generally People v. Botham, 629 P.2d 589 (Colo.1981) (detailing alternatives the court may choose in seeking to strike a proper balance between the right of the defendant to a fair trial and the rights of the public and the press).

6. Those jurors who could recall details of the alleged crime acknowledged their belief that newspapers are not always accurate in their reporting. None of the fourteen jurors were shown to have any preconceived opinion as to the defendant's guilt.

defendant failed to return in five or ten minutes, Tarwater fell asleep. He was awakened by the defendant who was sitting on the passenger's seat wrapped in a blanket and tapping him on the arm. The defendant told him that they had to leave and they proceeded to drive towards Kansas.

Nancy Talbott awoke about 4:00 a.m. on December 16th. On her way to the bathroom she noticed that the upstairs closet door was open and that her husband's guns, usually kept in the closet, were missing. She descended to the basement, where she saw her son but did not see either the defendant or Tarwater. Returning to the living room, she noticed blood on a pillow on the couch where eight year old Michelle Talbott had been sleeping. Upon investigating more closely she discovered that Michelle had been subjected to a brutal attack and had bled profusely from several wounds. Mrs. Talbott awoke her husband and, after discovering that their telephone lines had been cut, drove to the sheriff's nearby house. The ensuing investigation by law enforcement officers revealed indications of blood on the doorknob to the upstairs closet, on a nearby piece of paper and wall plaque, and on the upstairs telephone. The telephone lines, which had been cut on both the upstairs and downstairs telephones, had been positioned in such a manner as to conceal the cutting. A number of items were missing from the house, including three guns from the upstairs closet, $283 in cash from the upstairs bathroom, two piggy banks, a penny jar and a green rug from the kitchen, a quilt and a blanket from the basement, and a single boot which apparently had been on the steps leading upstairs.

About 4:30 a.m. on the same day the defendant and Tarwater pulled their pickup truck into a Husky truckstop in Limon, Colorado, hoping to replace a tire which had blown out. After Tarwater declined to buy a tire from the manager of the station because of its high price, the defendant picked up money from the floorboard of the truck and negotiated a purchase price. On this occasion, Tarwater, the station manager, and another attendant noticed a con-

siderable amount of blood on the defendant's hands, face and clothes, which he passed off as resulting from a nosebleed. The defendant then went to get something to eat and cleaned up in the restroom of the restaurant. Upon resuming their trip to Kansas, the defendant and Tarwater stopped at a rest area just across the Kansas border where the defendant discarded his bloody blue corduroy pants and changed into a pair of Tarwater's fatigue pants. They traveled until about 10:30 a.m., when a Kansas highway patrol officer, who had been alerted as to their possible destination, signalled them to pull over. The defendant urged Tarwater, who was driving the truck, to outrun the officer. Tarwater, however, stopped the truck, and the officer took them into custody. Acting upon information given to them by Tarwater, Kansas officers recovered the trousers which the defendant had previously discarded at the Kansas rest area.

The defendant, upon questioning, related that he could not recall the events of the previous evening, except for eating at the Talbotts' residence and frequenting several bars. In response to the question, "You don't remember cutting the little girl's throat?", the defendant put his face in his hands, became silent, and stated: "I may have done it. I don't remember. I could have done it." Blood located on the defendant's short sleeved white shirt, his blue corduroy trousers, and his jacket was found to be consistent with that of the victim, Michelle Talbott, and inconsistent with that of either the defendant or Tarwater.

An autopsy performed on the victim by Dr. Ben Galloway, Deputy Coroner for the City and County of Denver, disclosed that Michelle had sustained eight wounds, each of which had been inflicted by a sharp cutting instrument. One of the puncture wounds had been inflicted near the right ear and extended into the brain. Another puncture wound was to the chest and extended into the underlying lung tissue, while still another resulted in the laceration of a major branch of the lung veins. There was also a large gaping wound across Mic-

helle's neck, which included the severance of her carotid artery, jugular vein, and windpipe. This latter wound, according to the deputy coroner, was caused by repeated sawing motions and appeared to have been inflicted while the victim was still alive. The deputy coroner concluded from the autopsy that each of these four major wounds was capable of causing death. There were also two minor wounds on the victim's thumb.

At the conclusion of the prosecution's case the defendant rested without presenting any evidence. The court submitted to the jury the charge of first degree murder after deliberation and the lesser offense of second degree murder, as well as the charges of felony murder and robbery. The defendant's tendered instruction on reckless manslaughter was rejected. The jury returned guilty verdicts on first degree murder after deliberation, felony murder, and robbery. On September 20, 1979, the court sentenced the defendant to concurrent life sentences on the two first degree murder convictions and a concurrent sentence of one day to ten years on the robbery conviction. This appeal followed.

## II.

▮ We first examine the defendant's contention that the pretrial publicity in Arapahoe County surrounding the crime was so pervasive and prejudicial that the trial court erred in denying his motion for a second change of venue. In order to support this claim the defendant must show either that the publicity was so "massive, pervasive, and prejudicial" as to create "a presumption that he was denied a fair trial," or alternatively, that the publicity created actual prejudice or hostility towards the defendant on the part of the jury panel. *People v. Botham,* 629 P.2d 589, 597 (Colo. 1981); *see, e.g., Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The mere existence of extensive publicity, by itself, does not trigger a due process entitlement to a change of venue. As this court observed in *People v. McCrary,* 190 Colo. 538, 545, 549 P.2d 1320, 1325–26 (1976):

"The constitutional standard of fairness requires that a defendant have a panel of impartial and unbiased jurors. However, an important criminal case can be expected to generate much public interest and usually the best qualified jurors will have heard or read something about the case. To hold that jurors can have no familiarity through the news media with the facts of the case is to establish an impossible standard in a nation that nurtures freedom of the press. It is therefore sufficient if jurors can lay aside the information and opinions they have received through pretrial publicity.... Only when the publicity is so ubiquitous and vituperative that most jurors in the community could not ignore its influence is a change of venue required before voir dire examination."

▮ Our examination of the published newspaper reports submitted with the defendant's brief satisfies us that the publicity surrounding the homicide and ensuing trial was not so massive, pervasive and prejudicial as to create a presumption that the defendant could not be accorded a fair trial in Arapahoe County. The volume of newspaper accounts was not inordinate. The Rocky Mountain News and the Denver Post ran several articles when the crime occurred, but the incident was not reported again until jury selection commenced in Elbert County. Most of the newspaper accounts were placed with other stories of local crimes or criminal proceedings, with only a few occupying a prominent place in the newspaper. Although some of the articles appeared shortly prior to the defendant's trial in Arapahoe County, these articles emphasized primarily the change of venue arising from the difficulty in selecting a jury in Elbert County. The character of the newspaper publicity was neither sensational nor inflammatory in content. Although some stories referred to a specific source of information, the articles did not attempt to attribute any degree of credibility to the source. Nor were the articles long or detailed but, instead, outlined the basic facts related to the reporter. None of the

articles editorialized or appealed to the public's emotions. Considering the articles in their entirety, we cannot say that the newspaper coverage was so massive, pervasive and prejudicial as to justify a presumption that the defendant was denied his constitutional right to a fair trial.

■ Nor are we able to conclude that the publicity created actual prejudice or hostility on the part of the jury panel towards the defendant. Indeed, the voir dire examination of potential jurors in Arapahoe County failed to establish any obvious nexus between pretrial publicity and juror prejudice against the defendant. The trial court allowed extensive voir dire of the potential jurors to ensure that those selected would in fact be able to render an impartial verdict and resolved most issues relating to juror challenges in favor of the defense. The defendant did not challenge for cause any of the twelve regular and two alternate jurors actually sworn to try the case, all of whom expressed their ability to be impartial. Only three of the fourteen sworn jurors could remember any details of the case other than the change of venue from Elbert County, and six members had no recollection even of that event. Thus, none of the fourteen jurors sworn to try the case were shown to have any preconceived opinion as to the defendant's guilt.

The record, in summary, falls far short of demonstrating that the extent and character of pretrial publicity was so massive, pervasive and prejudicial as to create a reasonable likelihood that the defendant could not receive a fair trial in Arapahoe County. The record also fails to establish that the newspaper publicity created an actual prejudice or hostility on the part of the jurors ultimately sworn to try the case. The trial court, therefore, did not err in refusing to grant the defendant's motion to change venue from Arapahoe County to some other county of the state.

### III.

We turn to the defendant's argument that there was insufficient evidence of deliberation to submit to the jury the charge of murder after deliberation. We believe the record demonstrates sufficient evidence of deliberation to support the jury's verdict.

■ A motion for a judgment of acquittal should be granted only when the prosecution has failed to sustain its burden "of presenting evidence which, when viewed as a whole and in a light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crime beyond a reasonable doubt." *People v. Brassfield,* 652 P.2d 588, 592 (Colo.1982). The trial court, in other words, must give the prosecution the benefit of every reasonable inference which might be fairly drawn from the evidence. *E.g., People v. Franklin,* 645 P.2d 1 (Colo.1982); *People v. Gomez,* 632 P.2d 586 (Colo.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982); *People v. Elkhatib,* 632 P.2d 275 (Colo.1981); *People v. Ray,* 626 P.2d 167 (Colo.1981); *People v. Bennett,* 183 Colo. 125, 515 P.2d 466 (1973).

Section 18–3–102(1)(a), C.R.S.1973 (1978 Repl.Vol. 8), provides that a person commits the crime of murder in the first degree if "[a]fter deliberation and with the intent to cause the death of a person other than himself, he causes the death of that person or of another person." The term "after deliberation," as used in this statutory definition, means "not only intentionally but also that the decision to commit the act has been made after the exercise of reflection and judgment concerning the act. An act committed after deliberation is never one which has been committed in a hasty or impulsive manner." Section 18–3–101(3), C.R.S.1973 (1978 Repl.Vol. 8).

■ In *People v. Madson,* 638 P.2d 18 (Colo.1981), we recently considered the relationship between evidence of the use of a deadly weapon in causing death and the culpability element of "after deliberation" necessary for murder in the first degree. We reaffirmed the principle originally set forth in *Hill v. People,* 1 Colo. 436, 448 (1872), that the use of a deadly weapon, while not giving rise to a legal presumption

of deliberation, may nevertheless be considered, along with other circumstances attending the killing, in determining whether sufficient evidence exists for submission of the issue of deliberation to the jury. "The element of deliberation, like intent, can rarely be proven other than through circumstantial or indirect evidence. Thus, evidence of the manner in which the weapon is used may furnish some proof of the requisite culpability for first degree murder." *People v. Madson, supra* at 26. Also, while deliberation requires that a design to kill precede the killing, the length of time required for deliberation need not be long. *See People v. Sneed,* 183 Colo. 96, 514 P.2d 776 (1973); *Hinton v. People,* 169 Colo. 545, 458 P.2d 611 (1969), *cert. denied,* 397 U.S. 1047, 90 S.Ct. 1375, 25 L.Ed.2d 659 (1970); *People v. Maes,* 43 Colo.App. 365, 609 P.2d 1105 (1979). What is required for the element of deliberation is that the decision to kill be made after the exercise of reflection and judgment concerning the act. *People v. Madson, supra.*

■ The evidence in this case, when appropriately viewed, required the submission of the charge of first degree murder after deliberation to the jury. The circumstances surrounding the killing supported a reasonable inference that the defendant made the decision to kill Michelle Talbott after the exercise of reflection and judgment rather than, as he contends, in response to an overwhelming fit of violent rage. The evidence shows that the defendant entered the Talbott home during the night for the specific purpose of stealing property inside. There is no evidence whatever indicating that the eight year old victim did anything to provoke the defendant into a state of anger, much less a violent rage. The results of the autopsy showed that four of the eight wounds inflicted on the victim independently could have caused her death. Moreover, the nature and number of these wounds were such as to permit the inference that the attack on the victim continued even after she had been rendered helpless. In addition to the wounds, the blood stains in the upstairs hall strongly suggested that the victim was killed before the guns were

taken from the upstairs closet, thus providing further circumstantial evidence that the killing took place in order to prevent the victim from doing anything to obstruct the theft. The totality of evidence, when appropriately viewed, is sufficient to support the element of deliberation essential to first degree murder.

## IV.

■ We next examine the defendant's claim of error in connection with the trial court's refusal to instruct the jury on the crime of reckless manslaughter. We find his claim untenable.

The defendant's entitlement to an instruction on reckless manslaughter requires that there be a rational basis in the evidence to support a verdict acquitting him of a greater offense, such as second degree murder which was submitted to the jury, and convicting him of the lesser offense of reckless manslaughter. Section 18–1–408(6), C.R.S.1973 (1978 Repl.Vol. 8). *See, e.g., People v. Aragon,* 653 P.2d 715 (Colo. 1982); *Coston v. People,* 633 P.2d 470 (Colo. 1981); *Bowers v. People,* 617 P.2d 560 (Colo. 1980). Second degree murder is committed when a person causes the death of another "knowingly," but not after deliberation. Section 18–3–103(1)(a), C.R.S.1973 (1978 Repl.Vol. 8). A person acts "knowingly" with respect to a result when he is aware that his conduct is practically certain to cause the proscribed result. Section 18–1–501(6), C.R.S.1973 (1978 Repl.Vol. 8). Reckless manslaughter, on the other hand, involves the causing of another's death recklessly. Section 18–3–104(1)(a), C.R.S.1973 (1978 Repl.Vol. 8). "A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that a result will occur or that a circumstance exists." Section 18–1–501(8), C.R.S.1973 (1978 Repl. Vol. 8). "The distinction between the *mens rea* elements 'knowingly' and 'recklessly' mirrors the distinction between practically certain of result on the one hand, and probability or contingency of result on the other." *People v. DelGuidice,* 199 Colo. 41, 43,

606 P.2d 840, 842 (1979); *see also People v. Mingo,* 196 Colo. 315, 584 P.2d 632 (1978).

There is no rational basis in the evidence to support the submission of the charge of reckless manslaughter to the jury. The wound to the victim's neck and the severance of the main artery, jugular vein, and windpipe were inflicted by repeated sawing motions. The head wound extended into the victim's brain, and the two chest wounds were deep into the victim's lungs. To submit reckless manslaughter to the jury would mean that, under this state of the record, the jury could rationally find that the defendant did not inflict these wounds with a practical certainty that death would occur, as required for second degree murder, *People v. DelGuidice, supra; People v. Mingo, supra,* but, instead, did so with a mere conscious disregard of a fatal risk. The record, in other words, would have to provide rational support for a finding that the victim's death was the mere byproduct of conduct not knowingly directed towards causing her death. There is a total absence, however, of any evidence to support such a finding.

Nor, contrary to the defendant's argument, does the evidence of his heavy drinking on the evening of the homicide support an instruction on reckless manslaughter. Self-induced intoxication, while admissible to negate the existence of a specific intent, section 18–1–804(1), C.R.S.1973 (1978 Repl.Vol. 8), is not admissible to negate the culpability element of "knowingly" required for second degree murder, section 18–3–103(2), C.R.S.1973 (1978 Repl.Vol. 8). *See, e.g., People v. DelGuidice, supra.* By a parity of reasoning, evidence of self-induced intoxication, by itself, is not sufficient to downgrade second degree murder to reckless manslaughter. *See, e.g., People v. Aragon, supra; Hendershott v. People,* 653 P.2d 385 (Colo.1982); *People v. DelGuidice, supra.*

Finally, the defendant's argument on voluntary manslaughter ignores the jury's rejection of the lesser offense of second degree murder and its decision to convict of the more serious crime of first degree mur-

der. As we observed in *People v. Favors,* 192 Colo. 136, 140, 556 P.2d 72, 75 (1976), which involved an analogous situation, "[f]ailure to instruct on an even less serious offense than second-degree murder, in light of the jury's verdict for the most serious possible offense, does not comport with an inference of prejudice and did not deny the defendant a fair trial." *See also People v. Mullins,* 188 Colo. 23, 532 P.2d 733 (1975). We find no error in the trial court's rejection of the defendant's tendered instruction on reckless manslaughter.

## V.

The defendant claims there was insufficient evidence to support the crime of robbery and, therefore, his conviction for felony murder must fall. Section 18–4–301(1), C.R.S.1973 (1978 Repl.Vol. 8), defines robbery as follows: "A person who knowingly takes anything of value from the person or presence of another by the use of force, threats, or intimidation commits robbery." Conceding that there was evidence of an unlawful taking of property from the home, the defendant argues that the evidence failed to establish two essential elements of robbery. First, he asserts that the element of a taking from the "person or presence" of the robbery victim, Michelle Talbott, was not proven because the items taken were located in parts of the Talbott home other than the living room where Michelle was present, and, alternatively, because the evidence indicated that Michelle was asleep at the time the taking occurred. Second, the defendant contends that the taking was not accomplished by the use of force, as required for robbery, because there was no evidence that the killing occurred immediately prior to or at the same time as the taking. We find no merit in the defendant's arguments.

## A.

We are satisfied that the prosecution established a taking of property "from the presence" of the victim within the statutory proscription of robbery. It is quite obvious what the term "from the person of anoth-

er" means within the context of the robbery statute. The limits of the term "from the presence of another," however, are not so clear.

It has been stated that "presence" in the context of robbery "is not so much a matter of eyesight as it is one of proximity and control: the property taken in the robbery must be close enough to the victim and sufficiently under [her] control that, had the latter not been subjected to violence or intimidation by the robber, [she] could have prevented the taking." W. LaFave and A. Scott, *Handbook on Criminal Law* § 94 at 696 (1972). The word "presence" has been construed to encompass the taking of property from a location different from but near the place where the force, threats, or intimidation was initially employed against the robbery victim. *See, e.g., Cobern v. State,* 273 Ala. 547, 142 So.2d 869 (1962) (robbery committed where victim attacked and killed in her home and car stolen from her front yard); *State v. Atkins,* 549 S.W.2d 927 (Mo.App.1977) (property taken from closet in another room within a victim's presence or control). We hold that property is taken from the "presence of another" when it is so within the victim's reach, inspection or observation that he or she would be able to retain control over the property but for the force, threats, or intimidation directed by the perpetrator against the victim. *See United States v. Dixon,* 469 F.2d 940 (D.C.Cir.1972); *People v. Braverman,* 340 Ill. 525, 173 N.E. 55 (1930); *Commonwealth v. Homer,* 235 Mass. 526, 127 N.E. 517 (1920). Any narrower construction would "invite would-be perpetrators to waylay their victims in one location and then as part of the same transaction, to take their property from another nearby location, thereby avoiding guilt of robbery, even if the other elements of the offense were present." *State v. Thompson,* 37 N.C. App. 651, 661, 247 S.E.2d 235, 240–41 (1978). In this case, the "presence" element is broad enough to encompass the situation where the victim of the robbery, against whom the force, threats, or intimidation is directed, is present in one room of a family home and the taking occurs within another room.

Nor do we agree with the defendant's argument that the property was not taken from the victim's "presence" because the evidence indicated that she was asleep when the taking occurred. In fact, there was circumstantial evidence that the victim was awake prior to the attack and that the attack occurred prior to the taking. In order to reach the upstairs closet to take the guns, it was necessary for the defendant to go through the living room where Michelle was sleeping. Dr. Galloway, the deputy coroner, testified that the two minor wounds inflicted on Michelle's thumb were indicative of defensive efforts on her part to ward off an attack, thus indicating that she was awake at the time the attack occurred. Furthermore, the presence of blood in the upstairs area of the home circumstantially supports the inference that the killing, or at least the attack, took place before the guns were taken. We conclude that there was ample evidence indicating that the property was taken "from the presence" of Michelle Talbott, the robbery victim.

B.

Turning to the second prong of the defendant's argument, we are satisfied that the prosecution's evidence, when appropriately viewed, supports the conclusion that the taking of the property was accomplished by the use of force directed against Michelle Talbott. The gravamen of robbery is the application of physical force or intimidation against the victim at any time during the course of a transaction culminating in the taking of property from the victim's person or presence. *See, e.g., People v. Jenkins,* 198 Colo. 347, 599 P.2d 912 (1979); *People v. Thomas,* 181 Colo. 317, 509 P.2d 592 (1973); *Rowan v. People,* 93 Colo. 473, 26 P.2d 1066 (1933). There is no requirement that the application of force or intimidation must be virtually contemporaneous with the taking. Nor must the victim necessarily be aware of the taking. Indeed, where the application of force or intimida-

tion is employed for the very purpose of making the victim unaware of the taking, and property is thereafter knowingly taken from the person or presence of the victim, the statutory components of the crime are satisfied. *E.g., State v. Lora,* 561 S.W.2d 728 (Mo.App.1978); *State v. Williams,* 548 S.W.2d 227 (Mo.App.1977).

■ The evidence, as previously noted, indicates, that the defendant entered the Talbott house to steal guns, that the victim was in his path and awake prior to the attack, and that the attack occurred sometime prior to the taking. The totality of the evidence provides a reasonable basis in fact to conclude that Michelle was the victim of physical violence perpetrated against her during the course of an unlawful taking of property from her presence. There being sufficient evidence of the defendant's commission of the predicate crime of robbery, his challenge to his conviction of felony murder on grounds of evidentiary insufficiency must be rejected.

## VI.

The defendant's final claim centers on the entry of separate judgments of conviction and sentences for the crimes of felony murder and the predicate offense of robbery, and also for two counts of first degree murder for a single killing. We examine first the convictions of felony murder and robbery, and then the dual convictions of first degree murder after deliberation and felony murder.

## A.

The defendant submits that because the prosecution's proof of felony murder necessarily established every element of the

predicate felony of robbery, the latter crime was a lesser included offense of the former and, therefore, the constitutional prohibition against double jeopardy, *U.S. Const.* Amend. V and XIV; *Colo. Const.* Art. II, Sec. 18, and also the statutory prohibition of section 18–1–408(1)(a) and (5)(a), C.R.S.1973 (1978 Repl.Vol. 8), prohibit the entry of a separate judgment of conviction and sentence for the lesser included offense. Because we resolve this issue on statutory grounds, we need not address whether the separate judgments of conviction and concurrent sentences for the lesser included and greater offenses would be constitutionally prohibited under double jeopardy principles where the convictions and sentences result from the same criminal proceeding.[7]

■ Section 18–1–408(1), C.R.S.1973 (1978 Repl.Vol. 8), authorizes the prosecution for multiple offenses arising out of the same criminal conduct, but expressly prohibits multiple convictions when one offense is a lesser included of the other. For purposes of this statutory prohibition of multiple convictions, an offense is lesser included when, as provided in section 18–1–408(5)(a), C.R.S.1973 (1978 Repl.Vol. 8), "[i]t is established by proof of the same or less than all of the facts required to establish the commission of the offense charged." *See People v. Rivera,* 186 Colo. 24, 525 P.2d 431 (1974); *Daniels v. People,* 159 Colo. 190, 411 P.2d 316 (1966). Thus, if the proof of the greater offense as charged necessarily includes the very same elements required for the lesser offense, the lesser offense is necessarily included in the greater, and a conviction of the greater precludes a simultaneous conviction of the lesser. *People v. Hancock,* 186 Colo. 30, 525 P.2d 435 (1974) ("a defendant cannot be convicted of an

7. The United States Supreme Court, in *Missouri v. Hunter,* —— U.S. ——, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), recently interpreted the federal Double Jeopardy Clause as not to prohibit the prosecution, conviction, and consecutive sentencing of a defendant in a single criminal proceeding for the violation of two criminal statutes, both of which proscribe the same conduct, when the legislature has specifically authorized cumulative punishment under the two statutes. We have on other occasions interpreted the Colorado Double Jeopardy Clause more broadly than the United States Supreme Court's construction of the federal counterpart. *See People v. Quintana,* 634 P.2d 413 (Colo. 1981); *People v. Paulsen,* 198 Colo. 458, 601 P.2d 634 (1979). In this case, however, we need not determine the precise limits of the Colorado Double Jeopardy Clause because of our resolution of the matter on a statutory basis.

offense which is a lesser-included offense of another crime of which he was also convicted"); *People v. Bugarin,* 181 Colo. 62, 507 P.2d 875 (1973) (conviction of aggravated robbery precludes simultaneous conviction for assault with a deadly weapon, a lesser included offense of aggravated robbery).[8]

It is clear that the charge of felony murder based upon the causation of the robbery victim's death, either in the course of or in furtherance of the crime of robbery or in the course of immediate flight therefrom, requires proof of the very same elements essential to the charge of robbery. Under these circumstances the defendant's conviction of the greater offense of felony murder, predicated as it is upon his killing of the robbery victim, precludes his simultaneous conviction of the lesser included offense of robbery.

### B.

We next consider the defendant's dual convictions and sentences for first degree murder after deliberation and for felony murder, both of which involve the killing of a single victim, Michelle Talbott, on December 16, 1978. The defendant claims that the Double Jeopardy Clause of the United States and Colorado Constitutions, *U.S. Const.* Amend. V and XIV; *Colo. Const.* Art. II, Sec. 18, prohibits the entry of multiple convictions and sentences, even though concurrent, because he committed only one crime. We need not address the defendant's double jeopardy claim in this case because our recent decision in *People v. Lowe,* 660 P.2d 1261 (Colo.1983) permits a resolution of this matter on a narrower basis.

In *Lowe,* we held that the rule of lenity prohibited the entry of dual convictions and sentences for felony murder and murder after deliberation when the convictions and sentences were predicated upon the killing of a single victim:

"The legislature has not manifested any clear intent that a defendant could be convicted of more than one kind of first-degree murder where there is but one victim. The rule of lenity requires that the first-degree murder statute be construed to favor the defendant. That construction is that a defendant can be convicted only of one first-degree murder for one killing."

We also held in *Lowe* that, although the sentences for the dual first degree murder convictions were concurrent, "[o]nly one judgment of conviction and one punishment can be imposed for one first-degree murder." Because the defendant caused the death of one victim and only one victim, our decision in *Lowe* requires that only one judgment of conviction for first degree murder be entered.

An issue raised here and not resolved in *Lowe* is whether the defendant might be simultaneously convicted of robbery, which was the predicate felony for the felony murder charge, as well as first degree murder based upon a killing after deliberation. The elements of murder after deliberation do not include proof of the same facts necessary to establish the commission of robbery. The crime of robbery, therefore, is not a lesser offense of murder after deliberation, as it clearly is in the case of felony murder based upon the killing of the robbery victim during a robbery. Thus, although a separate judgment of conviction for robbery may not simultaneously exist

8. The People cite *People v. Roark,* 643 P.2d 756 (Colo.1982), for the proposition that robbery is not a lesser included offense of felony murder. In *Roark* we rejected the defendant's contention that the crimes of extreme indifference murder, section 18–3–102(1)(d), C.R.S.1973 (1978 Repl.Vol. 8); felony murder, section 18–3–102(1)(b), C.R.S.1973 (1978 Repl.Vol. 8); second degree sexual assault, section 18–3–403, C.R.S.1973 (1978 Repl.Vol. 8); and child abuse, section 18–6–401, C.R.S.1973 (1978 Repl.Vol. 8), merged into one crime and that double jeopardy principles prevented separate convictions for these offenses in the same criminal proceeding. We analyzed the elements of each offense under consideration and concluded that they were not identical and therefore did not merge. To say, however, that these offenses do not merge into one crime does not necessarily resolve the question whether any of them might be a lesser included offense of another for purposes of section 18–1–408(5)(a), C.R.S.1973 (1978 Repl.Vol. 8). The lesser included offense issue simply was never raised in *Roark,* and the People's reliance on *Roark* as controlling authority on that issue is misplaced.

with a judgment of conviction for first degree murder predicated upon the killing of the robbery victim, there is no such impediment to the entry of both a judgment of conviction for first degree murder based upon the killing of another after deliberation and a separate judgment of conviction for the robbery of the same victim.

The trial court should give as much effect to the jury's resolution of the issues submitted to it as can be done without running afoul of the defendant's constitutional and statutory rights. Because the jury found the defendant guilty of both first degree murder based upon the defendant's killing of Michelle Talbott after deliberation and the separate crime of robbery, and because these crimes do not relate to each other in a manner that precludes the entry of separate judgments of conviction on both offenses, the trial court should enter judgments of conviction on these two crimes and resentence the defendant accordingly.

The judgments of conviction and sentences imposed thereon are vacated and the cause is remanded for further proceedings consistent with the views herein expressed.

ROVIRA, J., does not participate.