23CA1128 Peo v Marler 05-14-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1128
Boulder County District Court No. 22CR455
Honorable Nancy W. Salomone, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Collin Sonny Kalel Marler,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE J. JONES
Lum and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 14, 2026

---

Philip J. Weiser, Attorney General, Brittany Limes Zehner, Senior Assistant
Attorney General and Assistant Solicitor General, Denver, Colorado, for
Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, River B. Sedaka, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Collin Sonny Kalel Marler, appeals the district court's judgment of conviction entered on jury verdicts finding him guilty of first degree murder (after deliberation) and menacing. He also appeals his sentence of life in prison without the possibility of parole (LWOP). We affirm.

## I.     Background

¶ 2     After moving out of his father's house, twenty-year-old Marler moved into a condo with his cousin (T.S.), his aunt (T.S.'s mother), and his grandmother. Marler brought his computer and kept it in T.S.'s room, where they often played computer games together.

¶ 3     Marler had been living at the condo only a week when he and T.S. got into a heated argument about T.S.'s room being messy. The argument ended that night when Marler moved his computer out of T.S.'s room and slept in the basement.

¶ 4     The next day, Marler heard his grandmother, his aunt, and T.S. discussing the previous night's argument. He accused them of talking about him behind his back, and he and T.S. started to argue. Marler's grandmother and aunt stepped in to stop the argument. Marler's grandmother, his aunt, and T.S. decided to go grocery shopping to put some distance between T.S. and Marler.

When they returned, Marler was in the first-floor bathroom, with the door shut. Marler's aunt and T.S. went to the basement, leaving Marler's grandmother in the living room. Marler stayed in the bathroom for at least thirty minutes.

¶ 5     Marler then came out of the bathroom holding a rifle. He went into the living room and removed the magazine from the rifle. His grandmother took the magazine from him and put it under her arm. Marler put the rifle on the couch and covered it with a blanket. Marler asked his grandmother, "[D]o you know why I've been in the bathroom?" His grandmother said she didn't, and Marler responded, "I've been trying to talk myself out of killing [T.S.]." Marler's grandmother told Marler that he wasn't going to kill T.S., and he replied, "Yes, I am. I am gonna kill him."

¶ 6     Marler and his grandmother talked for a few minutes about his intent to kill T.S. Several times, Marler told his grandmother he was going to kill T.S. Marler also kept trying to grab the magazine from his grandmother, and she eventually let him take it.

¶ 7     Marler's grandmother then told Marler, "If you and [T.S.] can't get this straightened out and come to an agreement, . . . you're going to have to go back to your dad's." Marler picked up the rifle

2

from the couch and said, "I'm gonna kill him." Marler's grandmother said, "Then I'm gonna call the cops," and Marler said, "You should call the cops. Go ahead." He then went into the basement and immediately shot T.S. numerous times, including once in the back after T.S. fell. Marler came back up from the basement, threw down the rifle, and ran out the front door. T.S. was taken to the hospital where he was later pronounced dead.

¶ 8     Shortly after Marler left the condo, officers pulled him over and found the rifle magazine in his pocket. Marler was arrested and charged with first degree murder (after deliberation) and menacing. A jury found him guilty on both charges. The district court sentenced him to LWOP in the custody of the Colorado Department of Corrections.

## II.    Discussion

¶ 9     With respect to the verdicts, Marler contends that the district court (1) abused its discretion by excluding his expert witnesses and (2) erroneously denied his attorney's challenges for cause to three prospective jurors. With respect to sentencing, he contends that (1) his sentence of LWOP is unconstitutional, and (2) the court erred by imposing restitution. We reject each of his contentions.

3

## A.    Marler's Expert Witnesses

¶ 10    Marler initially contends that the district court abused its discretion by excluding his proffered brain development expert witnesses because youthfulness isn't a mental condition requiring a court-ordered examination, and the experts weren't going to discuss his mental condition.  We conclude that any error was harmless.

### 1.    Additional Facts

¶ 11    Marler's attorney endorsed two expert witnesses to testify about brain development in adolescents.  Specifically, they were going to opine that "maturation of the prefrontal cortex is not fully complete until the mid to late twenties, with some speculating for men even into the early thirties" and that those without a fully formed prefrontal cortex tend to act more impulsively.

¶ 12    The prosecution moved to strike the experts.  It argued that this was "an attempt to introduce expert testimony related to a mental condition" and that such testimony wasn't admissible unless Marler underwent a court-ordered examination as required by section 16-8-107(3)(b), C.R.S. 2025.  Marler's counsel argued that section 16-8-107(3)(b) didn't apply because youthfulness isn't a mental condition and that the experts weren't going to discuss

Marler's mental condition specifically. Rather, counsel said, the testimony was being offered only to show the effect brain development "could have on the ability of an adolescent to form necessary culpable mental states." The court disallowed the testimony, ruling that it was subject to section 16-8-107(3)(b), with which Marler's counsel hadn't complied.

## 2. Standard of Review

¶ 13 "We review a trial court's determination regarding the admissibility of evidence for an abuse of discretion." *People v. Lane*, 2014 COA 48, ¶ 21 (considering a ruling denying expert testimony regarding the defendant's mental state). "A court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law." *People v. Ray*, 2025 CO 42M, ¶ 19.

¶ 14    We review preserved evidentiary errors for harmless error. *Id.*

at ¶ 20.[1]  "An error is harmless if it doesn't substantially influence

the jury's verdict or affect the fairness of the trial proceedings." *Id.*

### 3.    Analysis

¶ 15    Under section 16-8-107(3)(b), a defendant can't introduce

expert opinion of his mental condition without first undergoing a

court-ordered examination.  The term "mental condition" isn't

defined by the statute. *People v. Flippo*, 159 P.3d 100, 102 (Colo.

2007).  But the term has been broadly construed to include

learning disorders, *People v. Wilburn*, 2012 CO 21, ¶ 28; intellectual

---

[1] Marler argues that we should review the error under the
constitutional harmless error standard because it affected his
constitutional right to present a defense.  But "[a]n evidentiary error
precluding a defendant from presenting evidence may be of
constitutional magnitude 'only where the defendant was denied
virtually his [or her] only means of effectively testing significant
prosecution evidence.'" *People v. Shanks*, 2019 COA 160, ¶ 67
(quoting *People v. Brown*, 2014 COA 155M-2, ¶ 6).  Marler wasn't
deprived of his only way of attacking the prosecution's theory when
the court excluded his expert witnesses; thus, the constitutional
harmless standard doesn't apply.  Nonetheless, even if we were to
apply that standard, we would conclude that any error was
harmless beyond a reasonable doubt. *See Bartley v. People*, 817
P.2d 1029, 1034 (Colo. 1991) (constitutional error in admitting
evidence was harmless beyond a reasonable doubt when the
properly admitted evidence overwhelmingly proved the defendant's
guilt).

disabilities, *Flippo*, 159 P.3d at 105; and drug-induced intoxication, *People v. Herdman*, 2012 COA 89, ¶ 26.

¶ 16     Though the parties vigorously contest the issue, we don't need to decide whether the court abused its discretion because, even if it did, any error was harmless. *See People v. Kern*, 2020 COA 96, ¶ 7.

¶ 17     Marler's counsel's position in the district court was that the expert testimony was relevant to whether Marler deliberated before killing T.S. On appeal, Marler's position is the same. But the evidence showing that Marler deliberated, rather than acted impulsively, before murdering T.S. was overwhelming. *See Ruibal v. People*, 2018 CO 93, ¶ 17 ("If [the properly admitted] evidence overwhelmingly demonstrates the defendant's guilt, the error must be disregarded as harmless.").

¶ 18     One of the elements of first degree murder is that the defendant acted "[a]fter deliberation." § 18-3-102(1)(a), C.R.S. 2025. That term "means not only intentionally but also that the decision to commit the act has been made after the exercise of reflection and judgment concerning the act. An act committed after deliberation is never one which has been committed in a hasty or impulsive manner." § 18-3-101(3), C.R.S. 2025. Though "an

appreciable length of time must have elapsed to allow deliberation, reflection[,] and judgment . . ., that [time] need not be long." *People v. Sneed*, 514 P.2d 776, 778 (Colo. 1973) (citations omitted).

¶ 19     On the day of the murder, Marler spent at least thirty minutes in the bathroom deliberating whether to kill T.S. When he came out of the bathroom and told his grandmother that he intended to kill T.S., she said, "You're not gonna kill [him]," and he responded, "Yes, I am. I am gonna kill him." While Marler and his grandmother were talking, he repeatedly said that he was going to kill his cousin. And although he put down the rifle, covering it with a blanket, and gave the magazine to his grandmother when he came out of the bathroom, he took the magazine back from her during their conversation. When his grandmother said he was going to have to work things out with his cousin or he would have to go back to living with his father, he picked up the rifle; repeated, "I'm gonna kill him"; and went into the basement and shot T.S. several times.

¶ 20     Marler argues, however, that the jury could have found that, when he put down the rifle and covered it with a blanket, he no longer intended to kill T.S. but then made a "snap decision" to do so after his grandmother told him she was going to evict him.

Considering the whole of the evidence, we doubt that the jury reasonably could have concluded that there was any such break in his deliberative thought process. But even if the jury reasonably could have concluded that there was, the evidence of deliberation after Marler put down the rifle was overwhelming. During his conversation with his grandmother (after he put down the rifle), he told his grandmother several times (including after she threatened to evict him) that he was going to kill his cousin; he tried repeatedly to grab the magazine from his grandmother, did so, and loaded it in the rifle; and he told his grandmother that she should call the police. He then walked down the stairs and shot his cousin twelve times. Not only does this evidence show ample time for deliberation after his grandmother's ultimatum, but it also shows deliberation.

¶ 21    Based on this overwhelming evidence that Marler deliberated before killing his cousin, there is no "reasonable possibility that the outcome of the trial would have been different" if the experts had testified. *Ruibal*, ¶ 22.

## B.    Challenges for Cause

¶ 22    Marler contends that the district court abused its discretion by denying his attorney's challenges for cause to three prospective

jurors because those prospective jurors showed that they couldn't hold the prosecution to its burden of proof. We disagree.

1. Additional Facts

¶ 23 During voir dire, defense counsel asked the prospective jurors, "So who here thinks that if a person pulls the trigger of a gun, that act of pulling the trigger is an act done after deliberation?" Several prospective jurors raised their hands, including R.B., J.S., and M.Y.

¶ 24 Defense counsel asked prospective juror R.B. why he had raised his hand. R.B. said, "Well, it seems like to do something that drastic would require a deliberate action." Defense counsel asked R.B. to elaborate, and he said, "Well, of course, it's a very violent act. And the consequences are enormous. So it would seem like it would take a deliberate decision, at least from my perspective, to do that."

¶ 25 Defense counsel then moved on to prospective juror J.S. J.S., a school counselor, told defense counsel, "[My] context always goes back to, like, just the school setting. And I think, you know, if you're holding a gun, whether it's the amount of time you make the decision, you still deliberate about it." Defense counsel asked J.S., "[H]ow do you feel about separating the guilty act versus the guilty

10

mind? Is that something that you can do in your mind?" and J.S.

replied, "Yes." This exchange followed:

> [Defense counsel]: So you would require the district attorney, even if you heard evidence in this case that my client pulled the trigger of a gun, you wouldn't automatically infer that that was done after deliberation?
>
> [J.S.]: Well that's a hard one. I don't know. I just think, like, I kind of agree with what you were saying with, if you have a gun -- like, I personally don't have a gun, so I would never like think about using one, so it's hard to, like, think about having a gun, I guess. But I just think, like, I guess, from my context in the school, like anybody who brings a gun to school has deliberated about why they're bringing a gun to school and what they want to do with it, if that makes sense.
>
> . . . .
>
> [Defense counsel]: And so from your perspective, just on your personal experience with working at the school and what you've seen with kids who bring guns to school, they don't bring those without previously deliberating?
>
> [J.S.]: Correct.
>
> [Defense counsel]: So based on that experience, you automatically believe that if someone is, you know, shooting a gun, they've already deliberated?
>
> [J.S.]: Correct.

11

> [Defense counsel]: So, you know, if you were here today and had to swear an oath that the district attorney had to prove to you not only the shooting, but also the requisite mental state, it seems like you would just go ahead and infer from the act the mental state. Is that correct to say?
>
> [J.S.]: Correct.

¶ 26 Later, defense counsel posed another hypothetical to J.S., asking, "So what if a person pulls the trigger of a gun and shoots another person, so it's not just bringing a gun to school, they actually bring the gun to school, and they shoot it, and it hits another person, killing another person? Is that an act done after deliberation?" J.S. responded, "Yes." After an exchange between defense counsel and J.S., the court interrupted to clarify the law.

> [The court]: Could you clarify actually [w]hat the law says, and I think did you sort of say it earlier, so -- but jurors, the law says that a crime is committed when a person commits a voluntary act coupled with a culpable mental state. Proof of the act alone is insufficient. The People must also prove the mental state. And I think what [defense counsel] is really getting at is whether in this context you feel willing and able to separate those two things. The law requires that you do.
>
> [J.S.]: Yes.

12

[The court]: But [defense counsel] is also entitled to ask you questions about whether you think you can.

[J.S.]: Sure. Yeah, I think I could.

[Defense counsel]: And I know the Judge just talked about the law, but based on your personal experience at the school, what you've seen with school shootings, do you think you could swear an oath in this case to actually separate the two?

[J.S.]: Yes.

¶ 27     Defense counsel then asked R.B. his thoughts on the second hypothetical she had posed to J.S.

[R.B.]: Well, I guess it comes from my own perspective, but to do that, to me, it seems, as I said, very drastic, or other words to describe it and so on, but it would be -- if it happened, then it would be a result of deliberation.

[Defense counsel]: So to you, the act is so drastic that it would have to be something that was the result of deliberation?

[R.B.]: Yes.

[Defense counsel]: And you just heard the Judge instruct [J.S.] on the law that says that the act is separate from the mental state, and you can't presuppose from the act the mental state. Is that something that you could do if you were chosen as juror in this case?

[R.B.]: Yes.

[Defense counsel]: And that's kind of contrary to what you were just talking about. So walk me through exactly how you would do that.

[R.B.]: Well, it depends on what I hear as far as evidence and so on, that the mental state has to be proven. That could be argument or proven, or whatever the case is. And then the act, of course, could be proven, so -- or disproven, so it would depend on both those things. If the law requires that, then I would be careful to make sure both are affirmed by the argument, and then decide.

[Defense counsel]: Okay. But let's say that the district attorney just presents you evidence that my client pulled the trigger of the gun and someone died. There's no evidence of his mental state or after deliberation. From the act alone, would you be able to find Mr. Marler guilty or not guilty?

[R.B.]: I couldn't decide based on that, based on just only a trigger was pulled and someone was hit by a bullet and so on.

. . . .

[Defense counsel]: If you were a juror in this case, you would have to swear an oath that you would hold the district attorney to their burden. And that burden is requiring them to prove that both, there was an act as well as the mental state. They have to prove both of those elements to you beyond a reasonable doubt.

Based on what you're telling me right now, it sounds like that's not something that you would be able to do.

14

[R.B.]: Well, I could do that. As I say, I'm sorry that I'm not catching on here, but that I -- if I heard evidence that they had the mental state to do it and they actually did it, then I could agree that they are guilty.

[Defense counsel]: But let's say you hear no evidence of mental state, just of the act, just that this person shot a gun and killed -- and someone else died, that's all you hear?

[R.B.]: Well, that, as I was saying, that's not enough information, because they might have been looking the other way while they're pointing the gun or something.

[Defense counsel]: Okay. And so another law I want to talk with you is about the burden of proof. And so the burden of proof is on the district attorney's office, and that's proof beyond a reasonable doubt. And so they have to prove that for each and every element. And if they don't make their burden of proof, your vote has to be not guilty.

So in this situation, if they're not providing you information as far as the guilty mind, or the mental state, your vote would have to be not guilty. Is this something that you would be able to do?

[R.B.]: Yes.

[Defense counsel]: Okay. And you hesitated. Can you talk with me about that?

[R.B.]: Well, I guess I would have my doubts of my ability to do that, to say not guilty despite the evidence they may give, even if they -- if they prove one thing and not the other. Those

are two things.  And I would have my doubts about being able to say not guilty.

[Defense counsel]: And so is it fair to say that, sitting here today, you wouldn't be able to swear an oath that you would be able to uphold that law, hold them to their burden in that situation?

[R.B.]: Yes.

¶ 28    Defense counsel asked M.Y. about counsel's original hypothetical about "the shooter shooting someone multiple times intending to kill that person, and whether that person acted after deliberation."  Defense counsel asked M.Y. to explain why he had raised his hand in agreement.

[M.Y.]: Well, but you're being threatened, and in that context, I assume there's deliberation, very short time.  And you may pull the trigger multiple times in order to alleviate the threat.

Now, if you're just walking up to somebody and, saying, "I don't like your hat," and you pull the trigger multiple times, just, you know, because you don't like them, yeah, you've deliberated that.  You have a gun.  You're looking for somebody to harm.  And, you know, it's two different situations, obviously.

[Defense counsel]: Okay.  So what if the district attorney proved to you intent, but they didn't prove to you after deliberation?  Would you be able to vote not guilty?

[M.Y.]: I'm not sure the definition here of the "after deliberation."

[Defense counsel]: Yeah, so after deliberation means not only intentionally, but also that the decision to commit the act has been made after an exercise of reflection and judgment concerning the act. And I think what we're specifically talking about is the elements of murder in the first degree. So it requires that the act is done intentionally and after deliberation. So it requires that the district attorney prove to you both of those elements beyond a reasonable doubt.

If they were able to prove to you intentionally beyond a reasonable doubt, but they didn't prove to you beyond a reasonable doubt the after deliberation, would you be able to come back with a not-guilty verdict in this case?

[M.Y.]: I don't think so.

[Defense counsel]: Okay. And why not?

[M.Y.]: I believe if you intend to kill somebody, then you're guilty of the crime.

[Defense counsel]: Okay. So if they -- if they only proved to you that it was intentional, but they did not prove to you after deliberation, you wouldn't be able to come back with a not-guilty verdict in this case?

[M.Y.]: I wouldn't say a hundred percent.

¶ 29    Then, an unidentified prospective juror interrupted and asked,

"Does the act of reflection and -- what was the other? -- Judgment.

17

Does that have to come after the intent, or can it help to form the intent?"[2]  The court answered,

> I think part of why lots of jurors are having lots of trouble with these questions is because you're being asked them in a vacuum.  I can tell you that the law clearly requires that the proof of the act itself isn't sufficient if the jury doesn't also find, beyond a reasonable doubt, the mental state.  But in appropriate cases, jurors may decide that the same evidentiary facts that you believe demonstrates both the intent and the deliberation, and it may even be the nature of the act itself that does all that.
>
> So if folks are confused about, do there need to be three different things?  The answer to that question is no, there do not need to be three different things.  One thing could satisfy all, but conceptually, they are slightly different.  There are some legal circumstances where a jury could reasonably find that an act occurred without intent, and then the verdict would reflect that.
>
> There are also some legal situations where the jury might find that an act and intent occurred, but there wasn't deliberation.  But there don't have to be three different separate buckets that separate pieces of evidence fall into.

---

[2] The court reporter labeled this person as "prospective juror," so we don't know who asked the question.

¶ 30     Another prospective juror asked a question about this issue. After a very brief exchange with that prospective juror, defense counsel said, "Did that clear that up? Okay. Perfect."

¶ 31     At the end of voir dire, Marler's counsel challenged J.S., R.B., and M.Y. for cause.

¶ 32     Counsel asserted that R.B. had expressed doubts about his ability to render a not guilty verdict even if the prosecution didn't prove the required mens rea. The court denied the challenge, saying, "The Court believes that [R.B.] was confused about some of the questions, but he was completely unequivocal when he was asked to separate the idea of an act from intent."

¶ 33     Defense counsel also asserted that J.S. seemed unable to hold the prosecution to its burden of proof for the mens rea element of first degree murder. The court denied the challenge, saying that J.S. "was unequivocal about her ability to follow the law."

¶ 34     Lastly, defense counsel asserted that M.Y. said he wouldn't be able to render a not guilty verdict if the prosecution only proved intent and not deliberation. The court denied the challenge, saying that although M.Y. had trouble understanding defense counsel's hypotheticals, "[h]e did not demonstrate any resistance to the idea

that he would need to understand both [intent and after deliberation] in this case."

¶ 35    R.B., J.S., and M.Y. served on the twelve-person jury.

### 2.    Standard of Review and Applicable Law

¶ 36    "We review a trial court's decision regarding a challenge for cause for an abuse of discretion." *People v. Marciano*, 2014 COA 92M-2, ¶ 9.  "A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misconstrues or misapplies the law." *People v. Gulyas*, 2022 COA 34, ¶ 20.

¶ 37    To protect a defendant's constitutional right to an impartial jury, a court must grant a defendant's challenge for cause when a juror indicates an inability to remain impartial.  *People v. Abu-Nantambu-El*, 2019 CO 106, ¶ 16.  "If the trial court fails to excuse a biased juror who then serves on the jury, the error is structural

and requires reversal." *Gulyas*, ¶ 20.[3]  However, the court or the prosecutor can rehabilitate a prospective juror who expressed concerns or preconceived beliefs. *Marciano*, ¶ 8.  "If the potential juror indicates that she can set aside those beliefs and make a decision based on the evidence and the court's instructions on the law, she may still sit on the jury." *Id.*

¶ 38      A prospective juror shouldn't be excused simply because she misunderstands the law during voir dire. *People v. Clemens*, 2017 CO 89, ¶ 16.  If, after the district court explains the legal principles, a prospective juror is willing to impartially apply the law, she may be considered rehabilitated. *Id.* at ¶ 17.

---

[3] The People argue that this issue was waived because, although Marler's attorney used all ten of Marler's peremptory challenges, counsel failed to use available peremptory strikes on these jurors, instead using eight peremptories on prospective jurors whom Marler's counsel hadn't challenged for cause.  In *Morrison v. People*, 19 P.3d 668 (Colo. 2000), however, the Colorado Supreme Court held that a defendant's right to an impartial jury is violated if a biased juror sits on the jury, "[r]egardless of whether the defendant chose to use a peremptory challenge on the allegedly objectionable juror." *Id.* at 671.  Though there is some question whether the holding in *Morrison* is consistent with more recent cases and pronouncements by some supreme court justices, the Colorado Supreme Court hasn't overruled this aspect of *Morrison*.  *See People v. Robson*, 80 P.3d 912, 914 (Colo. App. 2003) (the Colorado Court of Appeals must follow Colorado Supreme Court precedent).

¶ 39    It is within the district court's discretion to determine whether

a prospective juror has been rehabilitated. *People v. O'Neill*, 803

P.2d 164, 173 (Colo. 1990). "Because the trial court is best able to

observe the juror's demeanor and evaluate the juror's assurances

that he or she can serve fairly and impartially, we defer to the trial

court's findings." *People v. Richardson*, 2014 COA 50, ¶ 37.

### 3.    Analysis

¶ 40    Marler argues that the court abused its discretion by denying

his attorney's challenges to R.B., J.S., and M.Y. because each of

them showed an inability to follow the court's instructions to

separate the act, the intent, and after the deliberation elements.

We conclude that the record supports the court's findings that each

juror could follow the court's instructions.

### a.    R.B.

¶ 41    While R.B. originally said that the act of shooting a gun is so

drastic that there must be deliberation, he later said he could

separate the act from the state of mind if the law required him to do

so. He also told defense counsel that he wouldn't be able to find

intent if the prosecution didn't prove it during trial. And, when

asked by defense counsel if he could find Marler not guilty if the

22

prosecution couldn't prove mens rea, he said, "Yes." Even though R.B. hesitated before saying yes, we can't conclude that his hesitancy meant that he was unable to follow the law, particularly given that R.B. had indicated that defense counsel's questions had confused him. Indeed, the response ("Yes") on which Marler relies most heavily was to a confusing question: "And so it is fair to say that, sitting here today, you wouldn't be able to swear an oath that you would be able to uphold that law, hold them to their burden in that situation?" *See People v. Veloz*, 946 P.2d 525, 531 (Colo. App. 1997) ("[T]he trial court is in the best position to assess the state of mind of a prospective juror through personal observation and the evaluation of what may appear to be inconsistent responses to difficult questions.").

### b.    J.S.

¶ 42    When the court explained the law to J.S., she said that she would be able to separate the act from the mental state. And when defense counsel asked J.S. if she "could swear an oath in this case to actually separate the two," she again said, "Yes." Although J.S. had said earlier during voir dire that she would infer the defendant's mental state from his actions, the record shows that

she was confused by defense counsel's hypothetical. However, once the law was clarified for her, she said that she could hold the prosecution to its burden of proving both the act and the culpable mental state.

### c. M.Y.

¶ 43 M.Y. initially said that he wasn't sure he would be able to give a not guilty verdict if the prosecution proved intent but not deliberation. However, the court then explained that proof of the act isn't sufficient; it said that the jury must also find the required mental state, but, depending on the nature of the act, the same facts may prove both intent and deliberation. Defense counsel then asked, "Did that clear that up?" While it's unclear who defense counsel was speaking to specifically, we can reasonably infer from the district court's reasoning for denying the challenge to M.Y. that none of the prospective jurors showed confusion about separating the actus reus from the mens rea element.[4] Also, both the prosecutor and the court recalled that M.Y. had indicated, after the

---

[4] Given this lack of clarity in the record, we think it especially appropriate to defer to the district court's superior position to evaluate all of what went on in the courtroom.

court explained the law, that he would require the prosecution to prove all elements of the offense. Defense counsel didn't dispute their recollections.

¶ 44    Thus, though a close question, we conclude that the district court reasonably determined that M.Y. could follow the law. *See Clemens*, ¶ 19 ("[A] prospective juror's silence in response to rehabilitative questioning constitutes evidence that the juror has been rehabilitated when the context of that silence indicates that the juror will render an impartial verdict according to the law and the evidence submitted to the jury at the trial.").

¶ 45    As to all three prospective jurors, we agree with the district court that defense counsel's questions and hypotheticals were confusing. And to the extent defense counsel indicated to the prospective jurors that a defendant's mental state can't be inferred from the defendant's actions, including the act causing the death itself, that was an incorrect statement of the law. *See People v. Dist. Ct.*, 779 P.2d 385, 388-89 (Colo. 1989); *People v. Bartowsheski*, 661 P.2d 235, 241-42 (Colo. 1983). It was for the district court to evaluate the effect of this questioning and its clarifying explanations of the law on the prospective jurors. And we are cognizant that the

district court was well positioned to evaluate the prospective jurors' demeanors and body language — things not reflected in the record.

## C.    LWOP

¶ 46     Marler contends that the district court erred by sentencing him to LWOP for first degree murder because that statutorily mandated sentence is categorically unconstitutional for a twenty-year-old.  We disagree.

¶ 47     "We review de novo the constitutionality of statutes." *Sellers v. People*, 2024 CO 64, ¶ 16.

¶ 48     The United States Supreme Court has held that a LWOP sentence for a person under the age of eighteen violates the Eighth Amendment.  *Miller v. Alabama*, 567 U.S. 460, 470 (2012).  The vast majority of courts that have considered the issue have refused to extend this prohibition to persons eighteen years or older.  It appears that three state courts have extended the prohibition to persons up to age twenty.  All three courts did so, however, based on their respective states' constitutions.  But the Colorado Supreme Court has observed that it hasn't interpreted the Colorado Constitution's counterpart to the Eighth Amendment, Colo. Const. art. II, § 20, "to provide greater protection than the Eighth

Amendment." *Sellers*, ¶ 36. Nor has Marler shown anything approaching a national consensus that would justify the conclusion that his sentence violates the Eighth Amendment.

¶ 49 It is true that, in recent years, the General Assembly has added a new category of "young adults" (defendants who are eighteen to twenty years old) to certain sentencing considerations. *Ray*, ¶ 177 (first citing §§ 17-34-101 to -102, C.R.S. 2025 (specialized program placement); and then citing § 17-22.5-403.7(1)(a)(III), C.R.S. 2025 (parole eligibility)). But "the legislature expressly excluded young adults . . . who were sentenced to LWOP" in such amendments. *Id.* And Colorado "has not yet followed" other states by extending the LWOP prohibition to include emerging adults. *Id.*

¶ 50 Under these circumstances, we can't conclude that Marler's LWOP sentence constitutes cruel and unusual punishment.

### D. Timeliness of Restitution Order

¶ 51 Lastly, Marler contends that the district court improperly ordered restitution because it reserved the issue at his sentencing hearing. We don't see any reversible error.

### 1. Additional Facts

¶ 52    At Marler's sentencing hearing on May 16, 2023, the prosecutor said, "I would ask to reserve restitution and cost of prosecution given how quickly we have set over sentencing. I will file something promptly as soon as I have more information about that." Defense counsel didn't object. The court said, "All right," and ordered the prosecution to file its restitution request within thirty-five days. The prosecution filed a restitution request for $3,294.79 on June 1, 2023. Marler's counsel didn't object to the amount, and the court ordered Marler to pay $ 3,294.79 in restitution on June 20, 2023, thirty-five days after sentencing.

### 2. Applicable Law

¶ 53    Restitution is governed by section 18-1.3-603, C.R.S. 2022.[5] A defendant must "make full restitution to those harmed by their misconduct . . . ." § 18-1.3-601(1)(b), C.R.S. 2025. Thus, every order of conviction must include an order regarding restitution.

---

[5] The statute was revised in May 2025, and the revisions included changing the time period for imposing restitution from ninety-one to sixty-three days. Ch. 307, sec. 1, § 18-1.3-603, 2025 Colo. Sess. Laws 1606-07. Because Marler's sentencing occurred in May 2023, we refer to the version of the statute in effect at the relevant time.

§ 18-1.3-603(1). A court may order that the defendant "is obligated to pay restitution" but that the amount will be determined within ninety-one days from the order of conviction. § 18-1.3-603(1)(b). A sentencing order that doesn't include an order under section 18-1.3-603(1) creates an illegal sentence that may be corrected at any time. *Tennyson v. People*, 2025 CO 31, ¶ 2.

### 3. Analysis

¶ 54 Even if we assume that the district court improperly reserved the issue of restitution, it corrected the illegal sentence before the ninety-one-day deadline; it therefore never lost authority to impose restitution and imposed restitution within ninety-one days. Thus, any error was harmless. *Cf. People v. Brasill*, 2024 COA 19, ¶¶ 56-58 (though the prosecution failed to comply with its obligation to use reasonable diligence in seeking an amount of restitution before or at sentencing, any error was harmless because the court ultimately ordered restitution before the ninety-one-day deadline) (*cert. granted* Aug. 4, 2025).

¶ 55 Marler argues, however, that this case is similar to *Snow v. People*, 2025 CO 32, ¶ 7, in which the supreme court vacated a restitution order because the prosecutor asked to "reserve

restitution" at sentencing. But *Snow* is distinguishable because, in that case, the supreme court vacated an *untimely* restitution order. *See id.* at ¶ 27 ("[T]he district court entered the post-sentencing restitution order . . . after expiration of the subsection (1)(b) deadline."). In this case, the court ordered restitution thirty-five days after sentencing, which was well before the deadline.

### III.   Disposition

¶ 56     We affirm the district court's judgment of conviction and sentence.

JUDGE LUM and JUDGE MEIRINK concur.