2012 COA 165

**The PEOPLE of the State of Colorado,**
**Plaintiff–Appellee,**

v.

**Tyrone Maurice WILLIAMS,**
**Defendant–Appellant.**

No. 10CA2045.

Colorado Court of Appeals,
Div. V.

Oct. 11, 2012.

John W. Suthers, Attorney General, Katherine A. Aidala, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellant.

Benezra & Culver, P.C., Seth J. Benezra, Sarah J. Parady, Lakewood, Colorado, for Defendant–Appellant.

Opinion by Judge FOX.

¶ 1 Defendant, Tyrone Maurice Williams, appeals the judgment of conviction entered on a jury verdict finding him guilty of first degree felony murder and three counts of aggravated robbery. We affirm in part, reverse in part, and vacate the sentence in part.

## I. Background

¶ 2 J.T. and his wife, A.T., were at their Denver tattoo shop when two men carrying handguns entered the shop through the back door. The men's faces were covered by masks or bandanas. The robbers ordered A.T. and her friend N.C. to the floor, and asked J.T., "Where is the shit [meaning drugs]?" When J.T. lunged at one of the robbers, the other robber shot J.T. The robbers searched J.T.'s pockets and removed cash before leaving the shop. J.T. died from the gunshot wound about thirty minutes after police arrived.

¶ 3 J.T. sold marijuana, and occasionally sold cocaine, from the tattoo shop. Before the shooting, Eddie Rideaux, a drug customer, entered the shop through the back door. Rideaux and J.T. spoke for about fifteen minutes, and Rideaux left about ten minutes before the robbery. Rideaux testified that Kenneth Darden and J.T. "had problems" involving the drug-dealing business before the robbery, but Rideaux did not know the details of the dispute.

¶ 4 S.G. testified that Darden had bought drugs from J.T., but did not receive all of the drugs he paid for, and that the two had an argument about the transaction a few days before the robbery. S.G. testified that he learned about the disagreement from Rideaux, who asked him to participate in a "lick," (meaning a robbery) of J.T.'s tattoo shop. S.G. refused to participate. A few days after the robbery, Rideaux told S.G. that "the lick was done."

¶ 5 A detective testified that eight months after the robbery, S.G. told her, "[Rideaux said that the plan was to] wait till dark, till the shop was closed. They were going to run in the back, lay [J.T.] down, take what they [could] ... and run back out." After the robbery, Rideaux told S.G. that he was not worried that J.T. would retaliate because "we blasted him."

¶ 6 Dewayne O'Bannon, who pled guilty to second degree murder for his involvement in the robbery, testified to the following:

- Darden organized the robbery;
- Williams asked O'Bannon to participate in exchange for money and drugs;
- The plan was for Rideaux to go to the shop to confirm that the drugs were there, and for Williams and O'Bannon to rob the shop;
- Williams carried a .38–caliber handgun, and O'Bannon carried a .45–caliber handgun, but the plan did not involve shooting anyone;
- After Rideaux left the shop, he called Williams and O'Bannon, who were parked nearby, to report that the drugs were there;

- Williams and O'Bannon, wearing ski masks, entered the shop from the back door and drew their weapons, and O'Bannon told J.T., A.T., and N.C. that he was robbing them;

- J.T. lunged toward O'Bannon, and as O'Bannon was stepping backward, Williams pushed O'Bannon away and shot J.T.;

- O'Bannon took "wads" of cash from J.T.'s pockets and Williams searched the office; and

- O'Bannon, Williams, Rideaux, and Darden shared the stolen money.

¶ 7 An expert in firearms and tool-mark analysis testified that the bullet in J.T.'s body was most likely fired from a .38–caliber gun, which was the type of gun that O'Bannon said Williams carried for the robbery.

¶ 8 S.A., Williams' friend since the seventh grade, lived with Rideaux, her boyfriend. She testified that Williams confessed to his involvement in the robbery and the shooting. S.A. told detectives that Williams told her "he went in [the tattoo shop] to rob [J.T.]" and that "[Williams] shot [J.T.]." S.A. testified that Williams told her that, after Rideaux left the shop, he and O'Bannon entered the shop. Williams told S.A. that J.T. "was acting all cocky so he just shot him." Williams also told S.A. that they stole some money. S.A. also testified that she did not originally tell police about Williams' confession because she "feared for her life."

¶ 9 T.M., who met Williams in the Denver County Jail, testified that Williams asked him, "Well, if somebody don't have no gun and they don't have no prints, then they ain't got nothin', right? I'm cool." Williams did not specify where the crime occurred, but said something "about a shop, some type of shop." T.M. testified that Williams told him that he received $7,000 and "some dope" from the robbery.

¶ 10 H.W. testified that she visited Williams in jail and that Williams told her that he had nothing to do with the incident. H.W.'s testimony was impeached when a detective testified that H.W. told him that, when H.W. visited Williams in jail, Williams told her that he was involved in the robbery, but was not the shooter.

¶ 11 A jury found Williams guilty of felony murder and three counts of aggravated robbery against J.T., A.T., and N.C. Williams appeals his conviction on grounds that (1) the trial court erred by denying his motion for a mistrial; (2) the trial court erred by admitting testimony that was "fruit of the poisonous tree"; and (3) there was insufficient evidence to support the aggravated robbery convictions.

## II. Mistrial

¶ 12 Williams first contends that the trial court erred by denying his motion for a mistrial because T.M.'s testimony that Williams threatened him was a discovery violation and was improper under CRE 404(b). We disagree.

### A. Standard of Review

¶ 13 "A mistrial is a drastic remedy warranted only when prejudice to the accused is so substantial that its effect on the jury cannot be remedied by any other means." *People v. Tillery*, 231 P.3d 36, 43 (Colo.App.2009), *aff'd sub nom. People v. Simon*, 266 P.3d 1099 (Colo.2011). "Because the trial court is in a better position to evaluate any adverse effect of improper statements or testimony on a jury, it has considerable discretion to determine whether a mistrial is warranted." *Id.* We will not disturb a trial court's decision to deny a mistrial "absent a clear showing of an abuse of discretion and prejudice to the defendant." *Bloom v. People*, 185 P.3d 797, 807 (Colo. 2008) (quoting *People v. Chastain*, 733 P.2d 1206, 1213 (Colo.1987)). A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair. *Tillery*, 231 P.3d at 40.

### B. Analysis

¶ 14 The challenged testimony occurred during direct examination of T.M.:

[Prosecutor:] Did [Williams] tell you in regard to this trial what he expected from [O'Bannon]?

[T.M.:] To do the right thing. [Williams] didn't say it to me. He said it to some-

body else that I was standing nearby, and I heard him.

[Prosecutor:] Was there a "do the right thing"?

[T.M.:] Or else.

[Prosecutor:] That's what you heard coming out of Mr. Williams' mouth?

[T.M.:] Yeah.

[Prosecutor:] From Mr. Williams' own mouth, did you learn anything about a message?

[T.M.:] Yeah. Basically that's the message that he sent to [O'Bannon], that he better do the right thing or else. [Williams] [s]ent a message to me. He threatened to murder me and my fiancée.

¶ 15 Following this exchange, defense counsel requested a mistrial. The trial court denied the motion for a mistrial, and instructed the jury to disregard the statement that Williams threatened to murder T.M. and his fiancée. The court explained to counsel that it decided to strike the remark "in an abundance of caution."

### 1. Mandatory Disclosure

■ ¶ 16 Williams first contends that the statement was inadmissible because the prosecution failed to disclose the alleged threat in violation of Crim. P. 16(I)(a)(1)(VIII), which requires that the prosecution make available to the defense "the substance of any oral statements made to the police or prosecution by the accused" that is within the possession or control of the prosecution. We disagree.

¶ 17 Because the challenged statement was not made by the accused to the police or prosecution, the prosecution was not required to disclose it under Rule 16. Crim. P. 16(I)(a)(1), (VIII); *see, e.g., People v. Denton,* 91 P.3d 388, 391 (Colo.App.2003) (the prosecutor did not commit a discovery violation by failing to disclose the substance of oral statements that were not exculpatory and that the prosecutor was not otherwise required to disclose under Rule 16).

### 2. Discretionary Disclosure

¶ 18 Williams also contends that the prosecution was "constitutionally compelled" to disclose the statement before trial pursuant to *People v. Smith,* 185 Colo. 369, 524 P.2d 607 (1974). Again, we disagree.

¶ 19 In *Smith,* our supreme court explained that former Crim. P. 16(c) vested discretionary authority in the trial court to compel the prosecution to disclose relevant and material information. *Id.* at 375, 524 P.2d at 610; *cf.* Crim. P. 16(I)(d) (current rule addressing discretionary disclosure). Defendant Smith twice sought discovery of recorded statements by the only surviving witness in a vehicular homicide. The court determined that the Crim. P. 16(c) ruling denying discovery of the statement was clearly erroneous because it precluded the defendant from making an informed decision as to whether to call the witness to the stand. 185 Colo. at 376, 524 P.2d at 611.

¶ 20 Here, unlike in *Smith,* the prosecution, and not the defense, called the witness who made the challenged statement. Williams does not explain how knowledge of the threat would have helped him make an informed trial decision. Consequently, we perceive no discovery violation under current Crim. P. 16(I)(d), the analog of former Crim. P. 16(c), or otherwise.

### 3. CRE 404(b)

¶ 21 Williams also contends that the statement was inadmissible CRE 404(b) evidence. Under CRE 404(b),

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

■ ¶ 22 We need not determine whether the statement was 404(b) evidence or was admissible under CRE 404(b) because a single remark about a defendant's past criminality does not necessitate a mistrial per se. *People v. Abbott,* 690 P.2d 1263, 1269 (Colo. 1984) ("the mere reference to an accused's past criminal act is not per se prejudicial, requiring a new trial"); *People v. Cousins,* 181 P.3d 365, 373 (Colo.App.2007) (one reference to a defendant's "extensive criminal history" does not require a new trial). Here, the trial court struck the statement from the record and instructed the jury not to consid-

er it for any purpose. *See People v. Ibarra*, 849 P.2d 33, 39 (Colo.1993) (absent a showing of jury bias, it is presumed that the jury understood and heeded the trial court's instructions).

¶ 23 Even assuming, without deciding, the statement was subject to 404(b) and was inadmissible, we conclude the statement was not substantially prejudicial because it was cumulative of other admissible testimony from witnesses who feared retaliation from Williams for testifying at his trial. *See People v. Mapps*, 231 P.3d 5, 11 (Colo.App.2009) (concluding that error was harmless when evidence was cumulative). Thus, the type of substantial prejudice that requires a mistrial was absent. *See People v. Perea*, 126 P.3d 241, 246 (Colo.App.2005) (affirming denial of a mistrial for testimony about the defendant's marijuana smoking, in light of similar uncontested and admissible evidence).

¶ 24 We conclude that the trial court did not abuse its discretion by denying Williams' motion for a mistrial.

### III. Fruit of the Poisonous Tree

¶ 25 Williams next contends that the trial court erred by admitting testimony from a witness whose identity was discovered from an illegal seizure, in violation of the "fruit of the poisonous tree" doctrine. We disagree.

### A. Standard of Review

¶ 26 A suppression issue presents mixed questions of law and fact. *People v. Alameno*, 193 P.3d 830, 834 (Colo.2008). We defer to the trial court's findings of fact, so long as sufficient evidence in the record supports the findings, and we review the trial court's conclusions of law de novo. *Id.*

### B. Relevant Facts

¶ 27 After the charged conduct occurred, H.W. was driving in Oregon, and Williams was in the passenger seat, when the police stopped the vehicle for speeding. Because H.W. had a suspended license, the officer asked Williams for identification.[1] Williams claimed he did not have identification. The officer asked to search the vehicle, and H.W. gave her consent. H.W. told the officer that

there was a pistol in a duffel bag behind the driver's seat, and "said in so many words" that it belonged to Williams.

¶ 28 Williams first told the officer that his name was Tyrone *Wilson,* and provided a date of birth, but did not provide photo identification. The officer checked the identification that Williams provided, but Wilson's photo and description did not match Williams' appearance. The officer again asked Williams who he was, and Williams claimed he was parolee Keith Nelloms. The officer asked Williams for a middle name, and Williams said he forgot. The officer arrested Williams, and Williams eventually provided his true identity. The Denver detective investigating Williams' case learned of H.W.'s identity from the Oregon police report.

### C. Analysis

¶ 29 The "fruit of the poisonous tree" doctrine provides that evidence derived from or acquired by the police through unlawful means is inadmissible and must be suppressed. *People v. Prescott*, 205 P.3d 416, 422 (Colo.App.2008). Williams contends that, because H.W.'s identity was discovered by the officer's unlawful seizure of Williams, her testimony should have been excluded.

¶ 30 The trial court concluded that the Oregon police unlawfully seized Williams because they lacked reasonable suspicion to detain him. Nonetheless, the trial court declined to suppress H.W.'s testimony because her identity was known from the legal traffic stop, rendering the fruit of the poisonous tree doctrine inapplicable. We affirm the trial court's ruling on different grounds. Because Williams' seizure was legal, the fruit of the poisonous tree doctrine was inapplicable. *See People v. Aarness*, 150 P.3d 1271, 1277 (Colo.2006) (appellate courts have discretion to affirm the trial court's denial of a defendant's motion to suppress on grounds different from those relied upon by the trial court).

¶ 31 It is well established that police may request identification without reasonable suspicion. *Hiibel v. Sixth Judicial*

---

1. The officer asked this question because police policy required impounding the vehicle unless another licensed driver in the vehicle could safely drive it with appropriate driving privileges.

*Dist. Court,* 542 U.S. 177, 185, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment."); *Florida v. Bostick,* 501 U.S. 429, 434–35, 111 S.Ct. 2382, 115 L.Ed.2d 389, (1991) ("[E]ven when officers have no basis for suspecting a particular individual, they may generally ... ask to examine the individual's identification ...." (citations omitted)); *INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) ("[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."). Probable cause to arrest exists when the objective facts and circumstances available to a reasonably cautious officer at the time of the arrest justify the officer's belief that an offense has been or is being committed by the person being arrested. *People v. Castaneda,* 249 P.3d 1119, 1122 (Colo.2011).

■ ¶ 32 Because Williams first provided the name of a person with different physical features and then provided a different name, but was unable to recall the middle name, the arresting officer had probable cause to believe that Williams provided false information in violation of section 807.620, Or.Rev.Stat. (2011).[2] *See Stafford v. State,* 2012 WL 691402 (Del.2012) (police officers had probable cause to arrest a passenger in a vehicle who provided false information about his identity during a traffic stop); *see also People v. O'Neal,* 32 P.3d 533, 538 (Colo.App. 2000) (an officer acquired probable cause to arrest a defendant following a traffic stop in which the defendant gave the officer a false name and had two outstanding arrest warrants); *cf. State v. Bishop,* 157 Or.App. 33, 967 P.2d 1241, 1244 (1998) (a defendant's brief hesitation and mistake in reciting his address when questioned by police officer, inability to provide any picture identification, and uncertainty as to status of his driver's license, following investigative stop for traffic violation, supported officer's subjective belief that the defendant had provided false information, but that belief was not objectively reasonable and did not establish probable

cause to arrest defendant). Because probable cause supported Williams' arrest, the fruit of the poisonous tree doctrine does not apply, and the trial court properly denied the motion to suppress H.W.'s testimony. *See, e.g., People v. Bradshaw,* 156 P.3d 452, 460–61 (Colo.2007) (holding that the trial court inappropriately applied the fruit of the poisonous tree doctrine because the statements that aided police officers in collecting the evidence suppressed by the trial court were not obtained unconstitutionally).

## IV. Sufficiency of the Evidence

¶ 33 Lastly, Williams contends that there was insufficient evidence to support the aggravated robbery convictions because A.T., the victim's wife, and N.C., the victim's friend, did not exercise control over, or have a right to control, the money taken from J.T.'s pockets. We agree as to N.C. only.

### A. Standard of Review

■ ¶ 34 We review the record de novo to determine whether the evidence before the jury was sufficient in quality and quantity to sustain the conviction. *Dempsey v. People,* 117 P.3d 800, 807 (Colo.2005). In so doing, we consider "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *Clark v. People,* 232 P.3d 1287, 1291 (Colo.2010) (quoting *People v. Bennett,* 183 Colo. 125, 130, 515 P.2d 466, 469 (1973)).

### B. Analysis

¶ 35 "A person who knowingly takes anything of value from the person or presence of another by the use of force, threats, or intimidation commits a robbery." § 18–4–301(1), C.R.S.2012. "A person who commits robbery is guilty of aggravated robbery if during the act of robbery ... [h]e knowingly wounds or strikes the person robbed or any other person with a deadly weapon or by the use of

**2.** We need not determine whether the officer also had probable cause to arrest Williams for being a felon in possession of a firearm where Williams told the officer that he was on parole, and H.W. indicated that the weapon in the vehicle belonged to Williams.

force, threats, or intimidation with a deadly weapon knowingly puts the person robbed or any other person in reasonable fear of death or bodily injury." § 18–4–302(1)(b), C.R.S. 2012.

¶ 36 Williams contends that the evidence was insufficient to support his aggravated robbery convictions against A.T. and N.C. because the jury could not reasonably conclude that Williams took money from their "presence." Williams argues that there was no evidence that N.C. had any legal right or control over the stolen money. Although the prosecution presented evidence that A.T., who was married to J.T., co-owned the tattoo shop, Williams argues that this was insufficient to support the conviction because there was no evidence that the stolen money was the tattoo shop's property.

¶ 37 While sufficient evidence clearly supported a finding that money was stolen from J.T.'s pockets, it is less clear whether sufficient evidence supported a finding that money was stolen from elsewhere in the shop. O'Bannon testified that Williams searched the office, but he did not testify that Williams stole anything from the office. O'Bannon testified that, other than the money, which he said came from J.T.'s pockets, they took "just a little amount of drugs." O'Bannon did not say where the drugs were found. Neither N.C. nor A.T., who witnessed the robbery, testified that the robbers searched anywhere other than J.T.'s pockets, or that they witnessed articles stolen from anywhere else in the shop. We thus conclude that the evidence was insufficient to show that articles were stolen from anywhere other than from J.T.'s pockets. We next assess whether the money in J.T.'s pockets was within N.C.'s or A.T.'s presence.

¶ 38 Property is taken from the "presence of another" for purposes of the robbery statute "when it is so within the victim's reach, inspection or observation that he or she would be able to retain control over the property but for the force, threats, or intimidation directed by the perpetrator against the victim." *People v. Bartowsheski*, 661 P.2d 235, 244 (Colo.1983).

¶ 39 In *Bartowsheski*, our supreme court explained that "presence" in the context of robbery

is not so much a matter of eyesight as it is one of proximity and control: the property taken in the robbery must be close enough to the victim and sufficiently under [her] control that, had [she] not been subjected to violence or intimidation by the robber, [she] could have prevented the taking.

*Id.* (quoting W. LaFave & A. Scott, *Handbook on Criminal Law* § 94, at 696 (1972)).

¶ 40 In *People v. Borghesi*, 66 P.3d 93 (Colo.2003), the supreme court applied the *Bartowsheski* principle and held that the defendant could be convicted of two counts of aggravated robbery where he brandished a hatchet and demanded money from two clerks who were counting money at a cash register. *Id.* at 103. The court explained that a defendant may be convicted of multiple charges so long as each employee possessed control over the employer's property, was subject to the robber's force, and was placed in reasonable fear of death or bodily injury. *Id.*

¶ 41 The victims' right to control the article taken was not at issue in *Borghesi* or *Bartowsheski*. Where the article is not in the victim's physical possession and there is a question of that victim's right to control the article, two divisions of this court have held that, "to take the property from such an individual's 'presence,' that individual must be exercising, or have the right to exercise, control over the article taken." *People v. Ridenour*, 878 P.2d 23, 27 (Colo.App.1994) (citing *People v. Benton*, 829 P.2d 451, 453 (Colo.App.1991) (customer did not have possession of, was not exercising control over, or had no right to control money in the cash registers)).

¶ 42 In *Ridenour*, a division of this court held that the evidence was insufficient to establish robbery of an employer's money, where the victim was an employee without access to, or the right to control, the money. 878 P.2d at 27. There, the defendant robbed a movie theater by tricking a ticket taker into leading him into the manager's office where a safe was located. *Id.* Once inside the office, the defendant ordered the ticket taker and all others present to lie on the floor, while instructing the assistant manager to open the safe and retrieve money. *Id.*

The division reversed the armed robbery conviction as to the ticket taker, explaining that there was insufficient evidence to establish that the property was within the ticket taker's presence because the ticket taker had no right to exercise any control over the safe or its contents. *Id.; cf. People v. Foster*, 971 P.2d 1082, 1085 (Colo.App.1998) (a loss prevention officer had right to exercise control over a store's property).

¶ 43 In *People v. Fox*, 928 P.2d 820 (Colo. App.1996), a division of this court found sufficient evidence to support a robbery conviction where the defendant shoved a man who was trying to recover his wife's purse from the defendant's wife, who took the purse from another woman's shopping cart inside a store. *Id.* at 821. The issue was whether force was applied in taking the purse, because the shoving occurred in a parking lot after the purse was taken. *Id.* In reaching its conclusion, the division recognized that it was undisputed that "the husband and the wife were both rightful owners of the property taken." *Id.* The division went on to explain: "[A]t the moment that defendant shoved the husband, he was utilizing force against a person who had a right to exercise control over an item of property that was still within his sight and which would have been within his control if not for defendant's use of force." *Id.*

 ¶ 44 Applying *Bartowsheski* and its progeny, we conclude that A.T., as the shop's co-owner and J.T.'s wife, who also helped operate the shop, had sufficient ownership or control over the money in J.T.'s pockets. Whether the money was taken from a cash register or from the pockets of her husband's pants, A.T. had an interest in protecting her husband and their property. But for Williams' use of force, and but for the gun's presence, A.T. would be expected to object to Williams' or O'Bannon's taking money from her husband's pockets, just like the husband in *Fox*, 928 P.2d at 821. *See State v. McGuire*, 131 Ariz. 93, 638 P.2d 1339, 1342 (1981) (defendant guilty of robbery under a similarly worded statute when he used force against victim to prevent her from resisting taking of husband's property); *State v. Riley*, 196 Ariz. 40, 992 P.2d 1135, 1141 (App.1999) (the defendant was guilty of six counts of armed robbery when he used deadly force to prevent resistance from six bank employees to his taking cash from the bank's vault).

 ¶ 45 In contrast, there was no evidence that N.C., a friend who just happened to be in the tattoo shop, had control over the money. She had no claim to the stolen money. Thus, evidence of A.T.'s relationship to J.T., and her co-ownership and operation of the shop, was sufficient to support the aggravated robbery conviction as to her, while the evidence was insufficient to support the aggravated robbery conviction as to N.C., because the stolen money was not taken from her "presence." *See Borghesi*, 66 P.3d at 103; *Bartowsheski*, 661 P.2d at 244; *Fox*, 928 P.2d at 821; *Ridenour*, 878 P.2d at 27; *Benton*, 829 P.2d at 453.

¶ 46 The judgment is reversed as to the conviction of aggravated robbery of N.C., and the sentence imposed for that conviction is vacated. The judgment is otherwise affirmed.

Judge CARPARELLI and Judge MILLER concur.