22CA1996 Peo v Heath 10-24-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1996
El Paso County District Court No. 20CR2435
Honorable Jill M. Brady, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Cohen Ellis Heath,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE LIPINSKY
J. Jones and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 24, 2024

Philip J. Weiser, Attorney General, Abigail M. Armstrong, Assistant Attorney General Fellow, Denver, Colorado, for Plaintiff-Appellee

Keyonyu X. O'Connell, Alternate Defense Counsel, Denver, Colorado, for Defendant-Appellant

¶ 1     Cohen Ellis Heath appeals the judgment of conviction entered on jury verdicts finding her guilty of first degree murder, robbery, tampering with a deceased human body, tampering with evidence, and accessory to murder.  We affirm.

## I.     Background

¶ 2     The evidence presented at trial showed the following.

¶ 3     Heath met E.K., a fifteen-year-old, at a behavioral health facility where the two of them were receiving treatment.  (Both Heath and E.K. are transgender.  At the time of trial, Heath used she/her pronouns, and E.K. used he/him pronouns.  We refer to the parties by those pronouns.)

¶ 4     E.K. and Heath became friends.  Heath proposed that she move into E.K.'s house, where E.K. lived with his mother, B.K.  E.K. asked B.K. whether Heath could live with them, describing Heath as a gay seventeen-year-old who had been kicked out of her home.  But E.K. knew that Heath was a divorced nineteen-year-old.  B.K. allowed Heath to live in her basement with E.K., but she would periodically tell E.K. that she was concerned about the living arrangement and wanted Heath to move out.

¶ 5     E.K. and Heath's friendship grew into a romantic and sexual relationship.  At trial, E.K. testified that he came to realize that the relationship was unhealthy, that Heath was very controlling, and that Heath isolated E.K. from B.K. and his friends.

¶ 6     E.K. testified that, after living with Heath for several months, Heath raised the idea of killing B.K.  Over time, Heath's plan became more concrete: E.K. would stab B.K., Heath would collect and sell B.K.'s belongings, and the pair would run off to Texas together.  Heath used escalating psychological pressure to convince E.K. to carry out the plan — in part by convincing E.K. that the final step in his gender transition was to "be a man" by killing B.K.

¶ 7     One night, while B.K. was sleeping, E.K. entered her bedroom while wielding a knife and stabbed her twice in the chest.  B.K. wrested the knife from E.K. and attempted to escape from the house, but she collapsed and died before reaching the front door.

¶ 8     After B.K. died, Heath told E.K. that she was proud of him. Heath then asked E.K. whether she could "have sex" with B.K.'s body, and E.K. assented.  Heath undressed and sexually abused B.K.'s body while E.K. video recorded Heath's actions using B.K.'s phone.  Heath then dragged B.K.'s body to a location in the living

room where it would be less visible from outside the house, covered it with blankets and dog beds, and positioned a television and dog gates in front of it. Later, Heath rummaged through B.K.'s belongings and took rings, clothing, and a Visa card.

¶ 9 The next morning, B.K.'s boyfriend came looking for her after she did not show up for work. As he knocked on the door, Heath and E.K. filled their backpacks with various items, including items belonging to B.K., and fled through the back door of the house. Police arrested them nearby a short time later.

¶ 10 The prosecution charged Heath with first degree murder (as a complicitor), felony murder, robbery, tampering with a deceased human body, and tampering with evidence. The prosecution also charged Heath with sexual exploitation of a child (E.K.). The trial court severed that charge and set it for a separate trial. (Heath later pleaded guilty to the charge.)

¶ 11 E.K. was similarly charged for his role in B.K.'s death. He pleaded guilty to second degree murder and was sentenced to forty years in the custody of the Department of Corrections before Heath's case went to trial. E.K. testified for the prosecution at Heath's trial.

¶ 12    The trial focused on Heath's involvement in the planning and

execution of B.K.'s murder.  A jury found Heath guilty as charged.

The court also instructed the jury on the lesser nonincluded offense

of accessory to murder, and the jury found Heath guilty of that

charge as well.

¶ 13    At Heath's sentencing hearing, the court merged her felony

murder and first degree murder convictions.  It sentenced Heath to

life without parole in the custody of the Department of Corrections.

## II.    Discussion

¶ 14    Heath raises three issues on appeal.  First, she challenges the

court's denial of her motion for a mistrial.  Second, she contends

that the prosecution did not introduce sufficient evidence to

support her convictions for tampering with a deceased human body

and robbery.  Third, she contends that she was prejudiced by a

variance between the complaint and information (the information)

and the evidence presented at trial in support of the robbery charge.

### A.    Denial of Heath's Motion for a Mistrial

¶ 15    Heath first claims that the court abused its discretion by

denying her motion for a mistrial after a detective testified regarding

incriminating statements that he claimed he could hear Heath

4

make in a video recording. We conclude that the court did not abuse its discretion.

### 1. Additional Background

¶ 16    The prosecution called Detective Kyle Lambert during its case-in-chief. Lambert testified that, shortly after Heath's arrest, officers placed her in a police station interview room equipped with a surveillance camera and microphone. The prosecutor offered into evidence a video recording depicting Heath pacing and talking to herself while alone in the room. The court admitted the recording into evidence, and the jury watched it in its entirety.

¶ 17    Lambert then testified (and our independent review confirms) that it is difficult at times to understand what Heath is muttering to herself on the video recording. But Lambert told the jury that, after reviewing the video recording, he was able to "pick out" what Heath was saying at certain parts of the video.

¶ 18    The prosecutor asked Lambert if he could understand Heath's statements at timestamp 15:05. Lambert answered, "Apologies to the Court. It's, 'Fuck. I wish we didn't fuck'n kill that bitch. Why did we do it? Why did we do it? Don't blame — cannot blame [E.K.]'" After Lambert finished answering the question, defense

5

counsel objected, arguing that Lambert's testimony did not accurately reflect Heath's words on the video, that "the evidence can speak for itself," and that "the jury can interpret the evidence that's been admitted by the District Attorney."

¶ 19    The court said that, under CRE 701, it would not permit Lambert to interpret additional statements that Heath made on the video recording because the jurors were in the same position as Lambert to hear Heath's words. But the court declined to strike Lambert's prior testimony regarding Heath's allegedly incriminating statements because "defense counsel didn't object until after the question was answered."

¶ 20    Upon further reflection, the court advised the parties that it was "reconsidering" its ruling, would strike Lambert's testimony, and would instruct the jury to disregard Lambert's interpretation of Heath's words. In doing so, the court said that Lambert's interpretation was "incredibly prejudicial." The court instructed the jury as follows:

> [A] question was asked of Detective Lambert during his initial questioning by [the prosecutor] about what [Heath] said in Exhibit 338 which was a video of [Heath]. I am striking [Lambert]'s answer to that question

6

> and ordering that you disregard that testimony. That means that you are to treat that statement as if you had not heard it and you must not consider it for any purpose.

¶ 21 At the conclusion of Lambert's testimony, jurors submitted several questions regarding the video. Two jurors asked whether the jury would be able to watch the video again. One of them asked, "Will the jury be able to see that video again *to try and hear what is being said*?" (Emphasis added.) With counsel's approval, the court instructed the jury that it would receive all evidence, including the video, at the trial's conclusion.

¶ 22 Another juror requested that the court ask Lambert, "If we can't hear the clip clearly[,] how are you confident in what you are hearing the defendant saying? Did you listen to an enhanced version[?]" Yet another juror asked, "Before the prosecution had no further questions for Det. Lambert, was his interpretation of the Defendant[']s words overruled or sustained as testimony?"

¶ 23 The court acknowledged that the latter two questions suggested that some of the jurors were confused about its earlier ruling and instruction. Accordingly, the court reiterated its admonition to the jury:

> There is a last question that's again related to the video of the defendant. And the Court will address this question just by reminding the jurors . . . of my instruction before we took a break which is that a question was asked of Detective Lambert during his initial questioning about what [Heath] said in Exhibit 338, which was the video of [Heath]. I am striking . . . [Lambert]'s answer to that question.
>
> And so the Court would order that you disregard that testimony. And that means that you are to act as though you have never heard that testimony and not consider it for any purpose, that particular answer only.

¶ 24    The next morning, defense counsel moved for a mistrial. Counsel argued that the jurors' questions evidenced the jury's inability to follow the court's instruction to disregard the stricken testimony. Counsel also argued that Lambert's testimony created an "auditory illusion" that would cause the jurors to "hunt and peck and try to see if they c[ould] find that statement or something similar to that statement."

¶ 25    The court denied defense counsel's request for a mistrial because (1) defense counsel did not make a timely objection to Lambert's testimony; (2) after defense counsel objected, the court did not allow Lambert to testify further regarding Heath's

statements on the video recording; (3) the court twice instructed the jury to disregard the challenged testimony; and (4) two jurors asked to independently review the video, suggesting that they understood the court's instruction.

¶ 26    During its deliberations, the jury asked the court, "Can we view the video of . . . Heath on a laptop in the room and have the option to use ear buds?  Because the sound is not great in the court room."  The court answered, "We will bring in a laptop with speakers.  You must use those."

2.    Applicable Law and Standard of Review

¶ 27    Under CRE 701, a lay witness may testify to opinions or inferences that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of [CRE] 702."  Lay opinion testimony is admissible under CRE 701 if "it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a firsthand witness to a particular event."  *People v. McFee*, 2016 COA

9

97, ¶ 76, 412 P.3d 848, 863 (quoting *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013)). A witness may not testify to conclusions that jurors are "competent to reach on their own," *id.*; such opinion testimony is not "helpful" to the jury, as CRE 701 requires.

¶ 28  Thus, if a jury is in "precisely the same position" as a witness to hear and interpret a defendant's recorded statements, and if the witness "was neither present when [the defendant] uttered the words nor so familiar with [the defendant's] voice that he was more likely to correctly identify the contested words" than the jury, the witness may not interpret what he believes the defendant said. *McFee*, ¶ 76, 412 P.3d at 863; *see also People v. Vergari*, 2022 COA 95, ¶ 19, 521 P.3d 391, 396; *People v. Rodriguez*, 2021 COA 38M, ¶ 12, 491 P.3d 547, 551.

¶ 29  But the admission of inadmissible evidence does not necessarily require a mistrial. *See People v. Johnson*, 2017 COA 11, ¶ 41, 446 P.3d 826, 832. A mistrial is "the most drastic of remedies." *People v. Owens*, 2024 CO 10, ¶ 125, 544 P.3d 1202, 1229 (quoting *People v. Collins*, 730 P.2d 293, 303 (Colo. 1986)).

For this reason, it is warranted "only when the prejudice to the defendant is too substantial to be remedied by other means." *Id.*

¶ 30    A court's instruction that jurors disregard erroneously admitted evidence is generally a sufficient remedy. *Johnson*, ¶ 42, 446 P.3d at 832. Such a curative instruction is only insufficient when the inadmissible evidence "is so highly prejudicial . . . it is conceivable that but for its exposure, the jury may not have found the defendant guilty." *Id.* (quoting *People v. Everett*, 250 P.3d 649, 663 (Colo. App. 2010)). Moreover, "[a] trial court can better evaluate any adverse effect that improper testimony might have upon a jury than can a reviewing court." *People v. Ned*, 923 P.2d 271, 274 (Colo. App. 1996).

¶ 31    We review the denial of a motion for a mistrial for an abuse of discretion. *People v. Burdette*, 2024 COA 38, ¶ 37, 552 P.3d 1108, 1117. A trial court abuses its discretion when its decision is "manifestly arbitrary, unreasonable, or unfair, or based on an erroneous understanding or application of the law." *Johnson*, ¶ 39, 446 P.3d at 832.

11

### 3. The Court Did Not Abuse Its Discretion by Denying Heath's Motion for a Mistrial

¶ 32 While we agree that Lambert's testimony was inadmissible under *McFee*, Heath failed to make a sufficient showing of prejudice to warrant a mistrial. Thus, the court appropriately exercised its discretion by denying Heath's motion for a mistrial.

¶ 33 We agree with the *McFee* division that a witness may not interpret recorded statements that the jury is equally equipped to decipher. Like the jury in *McFee*, the jury at Heath's trial was in "precisely the same position" as Lambert to "hear and interpret" Heath's recorded words. *McFee*, ¶ 76, 412 P.3d at 863. Lambert did not testify that he used enhancement techniques to discern the statements. Instead, he asserted that he merely reviewed the video "numerous times." Nor did Lambert testify that he had special familiarity with Heath's voice that would make him more likely than a juror "to correctly identify the contested words." *Id.*

¶ 34 Thus, his interpretation of Heath's recorded statements was inadmissible. But as in *McFee*, Lambert's interpretation did not result in the degree of prejudice sufficient to entitle the defendant to a mistrial. We reach this conclusion for three reasons.

12

¶ 35    First, Lambert's testimony did not result in substantial prejudice to Heath because the court twice instructed the jury to disregard the testimony. *See Owens*, ¶ 130, 544 P.3d at 1230 (reasoning that prejudice to a defendant is reduced when the trial court "employed several curative measures"). "We presume that the jury understands and will follow a trial court's curative instructions, absent evidence to the contrary." *Id.* at ¶ 128, 544 P.3d at 1230. As noted above, following Lambert's testimony, two jurors asked the court whether they could watch the video again. These questions indicated that at least some of the jurors understood and followed the court's first curative instruction and wanted to reach their own independent conclusion regarding Heath's statements.

¶ 36    Two juror questions, however, suggested that some of the jurors did not understand that instruction. But after weighing the testimony's prejudicial effect against the efficacy of the court's second, more detailed, curative instruction, the court determined that a mistrial was not warranted. We will not "second-guess the trial court's determination regarding . . . prejudice." *Id.* at ¶¶ 132-33, 544 P.3d at 1230.

¶ 37    Significantly, nothing in the record indicates that the jury disregarded the court's second instruction.  Rather, the record reflects the opposite.  During closing argument, the prosecutor told the jury, "You will get that video.  You determine what [Heath] is saying in that video.  But let me tell you to pay attention to 15:05[-]10."  The court then instructed the jury, "You are the sole judges of the credibility of each witness and the weight to be given to the witness's testimony. . . .  You may believe all of the testimony of a witness, part of it, or none of it."  During its deliberations, the jury asked the court for access to the video and headphones, showing that it understood its responsibility to closely review the video recording to attempt to determine what Heath said.

¶ 38    For these reasons, we conclude that the court took sufficient steps to cure any prejudice resulting from Lambert's testimony.  *See McFee*, ¶ 78, 412 P.3d at 864 (reasoning that prejudice to a defendant is reduced when the jury independently reviews recordings and was instructed to come to its own conclusion about what the defendant said); *see also Vergari*, ¶ 20, 521 P.3d at 396 ("[E]ven though it was improper for [a witness] to narrate the videos

as they played, the jury was free to disregard this opinion and come to its own conclusions, as the trial court explained.").

¶ 39 Second, Lambert's testimony did not cause substantial prejudice to Heath because she admitted her responsibility for B.K.'s death in other, more comprehensible parts of the video recording. She clearly said on the recording:

- "They cannot blame [E.K.]"

- "This is all my fault. All on me."

- "Why would you do this to [E.K.], why?"

- "I'm gonna be fucked."

Heath's trial counsel even conceded that Heath can be heard saying, "This is all my fault," on the video.

¶ 40 Thus, any prejudice resulting from Lambert's testimony was diminished when the jury heard Heath clearly admit fault on the video recording.

¶ 41 Third, Lambert's testimony did not result in substantial prejudice to Heath because other evidence supported her complicity in B.K.'s death. *See Rodriguez,* ¶ 12, 491 P.3d at 551. E.K. testified that killing B.K. was Heath's idea and that E.K. would not have stabbed B.K. but for Heath's influence. Moreover, the jury

viewed the video recording depicting Heath sexually abusing B.K.'s body and heard testimony that Heath was wearing B.K.'s rings when she was arrested.

¶ 42 Heath's argument regarding her theory of prejudice does not persuade us that the court erred by denying her request for a mistrial. She asserts that, because "nobody could decipher what was being said in the video," the jury was "left with Lambert's interpretation." After reviewing the video, we disagree. As we explain above, Heath can be heard on the recording admitting her role in B.K.'s death, even if her audible statements do not precisely match Lambert's characterization of Heath's words.

¶ 43 In addition, Heath points to an unrelated jury question regarding the trial court's complicity instruction. But we cannot discern from Heath's opening brief how that question has any bearing on her prejudice argument.

¶ 44 For these reasons, we perceive no abuse of discretion in the court's denial of Heath's motion for a mistrial.

### B. Sufficiency of the Evidence

¶ 45 Heath next contends that the evidence introduced at trial was insufficient to support her convictions for tampering with a

deceased human body and robbery. (Heath also argues that, because the prosecution failed to prove the predicate offense of robbery beyond a reasonable doubt, insufficient evidence supported her felony murder conviction. However, that argument is moot because the court merged Heath's first degree murder and felony murder convictions.)

### 1. Applicable Law and Standard of Review

¶ 46 "The Due Process Clauses of the United States and Colorado Constitutions require proof of guilt beyond a reasonable doubt on each of the essential elements of a crime." *People v. Duncan*, 109 P.3d 1044, 1045 (Colo. App. 2004). To decide whether the prosecution presented sufficient evidence to support the defendant's conviction, we ask "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *People v. Donald*, 2020 CO 24, ¶ 18, 461 P.3d 4, 7 (quoting *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010)).

¶ 47     Defendants may raise a sufficiency of evidence argument for the first time on appeal. *McCoy v. People*, 2019 CO 44, ¶ 2, 442 P.3d 379, 382. "[W]e review the record de novo to determine whether the evidence before the jury was sufficient both in quantity and quality to sustain the convictions." *Dempsey v. People*, 117 P.3d 800, 807 (Colo. 2005).

### 2. The Evidence Was Sufficient to Support Heath's Conviction for Tampering with a Deceased Human Body

¶ 48     The prosecutor was required to prove beyond a reasonable doubt that Heath tampered with a deceased human body in violation of section 18-8-610.5(1), C.R.S. 2024:

> A person commits tampering with a deceased human body if, believing that an official proceeding is pending, in progress, or about to be instituted and acting without legal right or authority, the person willfully destroys, mutilates, conceals, removes, or alters a human body . . . with intent to impair its . . . appearance or availability in the official proceedings.

¶ 49     According to Heath, no evidence proved that she (1) "believed an official proceeding was about to be instituted" or (2) possessed the requisite "intent to impair" the body's appearance or availability. We disagree.

18

¶ 50     First, the circumstantial evidence established beyond a reasonable doubt that Heath believed an official proceeding was pending.  A police investigation into a homicide is an official proceeding.  *See Taylor v. United States*, 267 A.3d 1051, 1061 (D.C. 2022) (holding that a likely police investigation constitutes an "official proceeding" for purposes of the offense of tampering with physical evidence).  E.K. testified that Heath's plan was to escape to Texas with E.K. after he killed B.K.  The jury could reasonably infer from Heath's plan that she knew a criminal investigation into B.K.'s death was imminent.  Heath also fled the house when B.K.'s boyfriend knocked on the door, further showing that she knew a proceeding was pending.

¶ 51     Moreover, the jury heard E.K.'s testimony that Heath moved B.K.'s body to the living room, covered it with blankets and dog beds, and positioned a television and dog gates in front of it.  The evidence further revealed that Heath or E.K. closed the living room blinds and cleaned the crime scene.

¶ 52     From this evidence, the jury could reasonably have inferred that Heath intended to conceal B.K.'s body to put off its discovery.  In addition, the evidence supported the inference that Heath sought

19

to delay the discovery of B.K.'s body so she would have sufficient time to collect and resell certain of B.K.'s belongings. More generally, the evidence showed that Heath was aware that police officers investigate homicides.

¶ 53    Thus, the circumstantial evidence was sufficient to establish that Heath knew an official proceeding was pending. *See People v. Newton*, 2022 COA 59, ¶ 29, 517 P.3d 79, 86 (explaining that, in the related context of evidence tampering, "a defendant's attempt to conceal an item is sufficient to establish the defendant's belief that an official proceeding was about to be instituted").

¶ 54    Second, the jury could infer from E.K.'s testimony that Heath concealed a deceased human body with the requisite intent. E.K. testified how Heath moved, covered, and concealed B.K.'s body.

¶ 55    Heath asserts that this evidence failed to prove that Heath *intended* to impair the appearance or availability of B.K.'s body. "But a defendant's intent can, and often must, be proved by circumstantial evidence." *People in Interest of J.O.*, 2022 COA 65M, ¶ 20, 517 P.3d 1259, 1263; *see also People v. Taylor*, 655 P.2d 382, 384 (Colo. 1982) ("[W]e have repeatedly recognized that direct proof of the defendant's state of mind is rarely available and,

20

consequently, resort must necessarily be had to circumstantial evidence on this element."). "A jury may properly infer intent from the defendant's conduct and the circumstances of the offense." *People v. Hines*, 2021 COA 45, ¶ 37, 491 P.3d 578, 586. The only reasonable inference that could be drawn from Heath's conduct and the surrounding circumstances was that Heath intended to impair the appearance of B.K.'s body so that it would not be immediately discovered.

¶ 56 For these reasons, sufficient evidence supported Heath's conviction for tampering with a deceased human body.

### 3. The Evidence Was Sufficient to Support Heath's Conviction for Robbery

¶ 57 The prosecution was required to prove beyond a reasonable doubt that Heath committed robbery in violation of section 18-4-301(1), C.R.S. 2024. "A person who knowingly takes anything of value from the person or presence of another by the use of force, threats, or intimidation commits robbery." *Id.*

¶ 58 The evidence at trial showed that Heath took at least one (and possibly two) of B.K.'s rings, including a wedding ring that B.K. stored in her home office. (B.K. was divorced from E.K.'s father.)

21

Heath also took E.K.'s father's wedding ring — which E.K. kept in his room. Moreover, Heath walked off with B.K.'s Visa card, which B.K. kept in her purse, and several articles of clothing that Heath found in B.K.'s bedroom.

¶ 59 Heath does not contest that each was an item "of value" or that she and E.K. procured those items "by the use of force." *See id.* Nor does Heath argue that she could not commit a robbery against someone who was already dead. Therefore, we do not address these issues. *See Compos v. People*, 2021 CO 19, ¶ 35, 484 P.3d 159, 165 ("Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." (quoting *Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008))) (alterations omitted).

¶ 60 Rather, Heath argues that the evidence was insufficient to sustain her robbery conviction because she did not take the items from B.K.'s "person or presence," within the meaning of section 18-4-301. Specifically, Heath argues that, because B.K. died in the entry way and living room area of her home and the objects were

located in different parts of the house, they were not in B.K.'s "presence" when Heath took them. We are unpersuaded.

¶ 61 "For property to be in a victim's 'presence,' the victim must be exercising, or have the right to exercise, control over the item taken." *People v. Mortenson,* 2023 COA 92, ¶ 8, 541 P.3d 639, 642. The property must be "so within the victim's reach, inspection or observation that [the victim] would be able to retain control over the property but for the force, threats, or intimidation directed by the perpetrator against the victim." *People v. Williams,* 2012 COA 165, ¶ 38, 297 P.3d 1011, 1018 (quoting *People v. Bartowsheski,* 661 P.2d 235, 244 (Colo. 1983)). "'[P]resence' in the context of robbery 'is not so much a matter of eyesight as it is one of proximity and control . . . .'" *Bartowsheski,* 661 P.2d at 244 (quoting W. LaFave and A. Scott, *Handbook on Criminal Law* § 94 at 696 (1972)). Thus, "the 'presence' element is broad enough to encompass the situation where the victim of the robbery, against whom the force, threats, or intimidation is directed, is present in one room of a family home and the taking occurs within another room." *Id.*

¶ 62 We conclude that B.K.'s wedding ring, Visa card, and clothing were within B.K.'s presence at the time Heath took them. Because

23

these items belonged to B.K., she had the right to exercise control over them.  Although Heath took the items from various rooms in B.K.'s house, B.K. kept all of them inside her home, which was within her inspection and control, meaning that she could have prevented Heath from taking them had E.K. not used deadly force against her.  *See id.*

¶ 63     Finally, Heath challenges the prosecution's theory at trial that she also committed robbery by removing B.K.'s night shirt and underwear before sexually abusing B.K.'s body.  We are skeptical that removing clothing to commit a sexual act constitutes a taking within the meaning of the robbery statute.  *See* Merriam-Webster Dictionary, https://perma.cc/65G8-3H42 (to "take" is "to get into one's hands or into one's possession, power, or control" or "to transfer into one's own keeping").  Nevertheless, we need not decide whether Heath's removal of B.K.'s clothing was a robbery.  The evidence showed that Heath took rings, a Visa card, and clothing from B.K.'s home.  That evidence alone was sufficient for the jury to conclude that Heath was guilty of robbery beyond a reasonable doubt.

24

## C.    Variance

¶ 64    Heath's final claim of error is that, during closing argument, the prosecution "expanded the bases upon which Heath could be convicted" of robbery by identifying specific property that had not been identified in the information.  (Heath argues that this purported error also requires reversal of her conviction for felony murder, because robbery was the predicate offense for such conviction.  This argument is moot, however, because, as noted above in Part II.B, the court merged Heath's felony murder and first degree murder convictions.)

### 1.    Applicable Law and Standard of Review

¶ 65    "The U.S. and Colorado Constitutions guarantee defendants the right to be notified of the charges against them." *People v. Martinez*, 2024 COA 34, ¶ 21, 552 P.3d 551, 556 (quoting *Hoggard v. People*, 2020 CO 54, ¶ 22, 465 P.3d 34, 40).  An information provides such notice by apprising a defendant of the offense charged and the surrounding factual circumstances so the defendant can adequately defend against the charge.  *Id.*

¶ 66    "A variance occurs when the charge contained in the charging instrument differs from the charge for which a defendant is

25

convicted." *Campbell v. People*, 2020 CO 49, ¶ 45, 464 P.3d 759, 768.  "Generally, there are two types of variances: simple variances and constructive amendments." *People v. Deutsch*, 2020 COA 114, ¶ 25, 471 P.3d 1266, 1273.

¶ 67    "A simple variance occurs when the charged elements are unchanged, but the evidence presented at trial proves facts materially different from those alleged in the indictment." *Id.* (quoting *People v. Pahl*, 169 P.3d 169, 177 (Colo. App. 2006)).  "A simple variance generally does not require reversal as long as the proof upon which the conviction is based corresponds to an offense that was clearly set out in the charging instrument." *Campbell,* ¶ 45, 464 P.3d at 768.

¶ 68    In contrast, a "constructive amendment occurs when a jury instruction 'changes an essential element of the charged offense and thereby alters the substance of the charging instrument.'" *Bock v. People*, 2024 CO 61, ¶ 14, 555 P.3d 629, 632-33 (quoting *People v. Rediger*, 2018 CO 32, ¶ 48, 416 P.3d 893, 903).

¶ 69    We review de novo whether a variance occurred.  *People v. Rail*, 2016 COA 24, ¶ 48, 457 P.3d 608, 617, *abrogated on other grounds by Bock*, ¶ 19, 555 P.3d at 633.  Because Heath's counsel

did not preserve this issue for appeal, reversal is required only if the court erred by permitting a variance and such error was plain. *See Bock*, ¶ 14, 555 P.3d at 632-33; *Deutsch*, ¶ 22, 471 P.3d at 1272. An error is plain if it is obvious and "so undermined the fundamental fairness of the trial itself . . . as to cast serious doubt on the reliability of the judgment of conviction." *Hagos v. People*, 2012 CO 63, ¶ 14, 288 P.3d 116, 120 (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).

### 2. Even if the Court Erred by Allowing a Variance, the Error Was Not Plain

¶ 70    The information set out the offense of robbery as follows: "Between and including January 25, 2020, and April 28, 2020, [Heath] unlawfully, feloniously, and knowingly took a thing of value, namely: jewelry, from the person or presence of [B.K.] by the use of force, threats or intimidation; in violation of section 18-4-301(1), C.R.S."

¶ 71    The corresponding jury instruction defined the elements of robbery as follows:

> 1. That the defendant,
>
> 2. in the State of Colorado, at or about the date and place charged,

27

3. knowingly,

4. took anything of value,

5. from the person or presence of another,

6. by the use of force, threats, or intimidation.

¶ 72    The information and the jury instructions consistently reflected the "took anything of value" element of robbery. *See* § 18-4-301(1). Indeed, the information adequately put Heath on notice that she would have to defend against the allegation that she took a thing of value from B.K. — the robbery offense of which she was later convicted. There was no constructive amendment because the jury instructions did not change an essential element of the offense of robbery. *See Bock*, ¶ 14; 555 P.3d at 632-33; *see also Pahl*, 169 P.3d at 178 ("By adding other components of the statutory definition of 'security' to the one listed in the indictment, the instruction did not change the elements of the offense, as the prosecution still had to prove defendant engaged in specified conduct in connection with a security.").

¶ 73    Nevertheless, Heath argues that, because the information identified jewelry as the only "thing of value," she was unprepared

to defend against the prosecution's allegation at trial that Heath took additional property, including B.K.'s Visa card and clothing.

¶ 74     A discrepancy between the information and the evidence introduced at trial creates a simple variance only if the evidence proved facts "materially different" from those alleged in the information. *Deutsch*, ¶ 25, 471 P.3d at 1273. Whether the evidence at trial proves "materially different" facts when it establishes the facts described in the information *plus* additional facts is a close question. However, we conclude that a simple variance occurred because the prosecution expanded the charge beyond the facts alleged in the information. *See People v. Vigil*, 2015 COA 88M, ¶ 32, 459 P.3d 553, 562 (holding that a simple variance occurred when the prosecutor alleged in an oral bill of particulars that the defendant burglarized three structures but referred to a fourth structure during closing argument), *aff'd*, 2019 CO 105, 455 P.3d 332; *Rail*, ¶ 53, 457 P.3d at 617 (holding that, when trial testimony indicated that a particular incident occurred outside the timeframe alleged in the information, the discrepancy "epitomizes a simple variance"); *People v. Smith*, 2018 CO 33, ¶¶ 26-31, 416 P.3d 886, 892 (holding that any error was not plain when

the prosecution specified a named victim in the information but omitted the named victim in the jury instructions, arguably allowing the jury to consider whether the defendant committed the act against two different victims).

¶ 75    In any event, even if there was a simple variance, any error was not plain because it was not substantial.  *See Hagos*, ¶ 14, 288 P.3d at 120.  A variance does not prejudice a defendant's substantial rights when the defendant "does not complain [she] was unaware of the essential facts" supporting the charge; "does not argue [she] would have challenged the prosecution's case differently"; does not "indicate [she] could have produced different evidence in [her] defense"; and "did not file a motion for a bill of particulars to clarify the indictment."  *Pahl,* 169 P.3d at 178.

¶ 76    Heath's counsel did not claim lack of awareness that the police had discovered and collected B.K.'s Visa card and clothing.  Heath's counsel had an opportunity to confront the prosecution's allegations at trial, and Heath does not argue that her counsel would have presented a different defense or produced different evidence if the attorney had received notice regarding either the Visa card or the clothing earlier in the proceedings.  Nor did Heath's

counsel file a motion for a bill of particulars. For these reasons, we conclude that any simple variance did not substantially impair Heath's ability to present a defense.

¶ 77 Further, overwhelming evidence supported Heath's robbery conviction on the basis charged in the information — that Heath was wearing B.K.'s wedding ring at the time of her arrest. Thus, the proof upon which Heath's conviction was based corresponded to facts "clearly set out in the charging instrument." *Campbell*, ¶ 45, 464 P.3d at 768.

¶ 78 Accordingly, we conclude that any error caused by the simple variance was not plain.

## III. Disposition

¶ 79 The judgment is affirmed.

JUDGE J. JONES and JUDGE SULLIVAN concur.